ALBERT ET AL. *v.* MILK CONTROL BOARD OF INDIANA.

[No. 26,624. Filed March 26, 1936. Rehearing denied June 30, 1936.]

*Dudley M. Shively* and *Walter R. Arnold,* for appellants.

*Philip Lutz, Jr.,* Attorney-General, *Fred A. Wiecking,* Deputy Attorney-General, *Eggeman, Reed & Cleland* and *Jones, Obenchain & Butler,* for appellee.

HUGHES, J.—This is a consolidation proceeding brought originally by appellee as two separate identical actions, the first against appellant Frank Albert, and the second against appellant Delbert Schafer, both being actions for penalties and an injunction predicated upon the charge that the appellants were and for some time past had been engaged in the business of milk dealer, processer, distributor-producer, and distributing broker of milk without paying the license fee imposed, and without obtaining a license as required by Chapter 281 of the Acts of 1935 of the General Assembly of the State of Indiana (§§15-1701—15-1725, Burns 1933 Supp., §§3647-4 et seq., Baldwin's 1934 Supp.).

There were two paragraphs of complaint, the first to

recover the penalties fixed in the act, and the second was for an injunction to restrain each of the appellants from continuous violation of the act. The cases were consolidated, and the appellants separately and severally demurred to the complaint. The demurrer was overruled, and the appellants then filed four paragraphs of answer and a cross-complaint. The cross-complaint asked that the court declare the rights and status of the cross-complainants relative to different provisions of said act. A demurrer was filed to each paragraph of answer and the same was sustained. Motion by the appellee to strike out cross-complaint was overruled, and a demurrer to the cross-complaint was overruled. There was a judgment upon the pleadings without the introduction of any evidence. A motion for a new trial was filed by appellants which was overruled. The errors assigned for reversal are as follows:

1. The trial court erred in overruling appellants' separate and several demurrer.

2. The trial court erred in sustaining the appellee's demurrer to each paragraph of appellants' several answer.

3. The trial court erred in sustaining appellee's demurrer to the first paragraph of appellants' separate and several answer to the complaint.

4. The trial court erred in sustaining appellee's demurrer to the appellants' separate and several second paragraph of answer to the complaint.

5. The trial court erred in sustaining appellee's demurrer to appellants' separate and several third paragraph of answer to the complaint.

6. The trial court erred in sustaining appellee's demurrer to appellant's separate and several fourth paragraph of answer to the complaint.

7. The trial court erred in overruling appellants' motion for a new trial.

The Milk Control Act was enacted and approved March 12, 1935. Acts of 1935, Chapter 281, p. 1365. The Act consists of twenty-six sections and covers twenty pages. The title of the act is as follows:

"An Act declaring an emergency concerning the production and distribution of milk, creating a milk control board and defining its powers and duties and declaring an emergency." The appellants contend that the title of the Act is insufficient and in contravention of Art. 4, Sec. 19, of the Constitution of Indiana.

The above section has been thoroughly discussed and passed upon by this court and, as said in many cases, the purpose of the section is to prevent surprise or fraud in the legislature by means of a provision or provisions in a bill of which the title gave no information and to apprise the people of the subject of legislation under consideration. *Crabbs* v. *State* (1923), 193 Ind. 248, 139 N. E. 180. And it is also intended to prevent a combination of non-related subjects in the same act. *Sarlls* v. *State ex rel. Trimble* (1929), 201 Ind. 88, 166 N. E. 270. Moreover, "it is not necessary that the title of an act furnish a complete index to its contents. It will be sufficient to meet constitutional requirements when, upon a liberal construction, it is sufficient to apprise the legislators and the public in general of the subject-matter of the legislation. Or, in other words, if it be so framed as to reasonably lead to an inquiry into the body of the bill, it is sufficient." *Gmeiner* v. *State* (1925), 197 Ind. 43, 149 N. E. 728; *State* v. *Arnold* (1895), 140 Ind. 628, 38 N. E. 820. It has also been held by this court that where the title relates to a subject which is broad enough to make it possible to comprehend different matters, which might or might not be included in the subject as means to a given end, courts will solve doubtful questions as to the relation of a particular matter to the subject in favor of the legislation. *State ex rel.* v. *Board* (1906), 166 Ind. 162, 76 N. E. 986.

With the foregoing rules of construction in mind we think the title of the Act is sufficient. It is sufficient to apprise the public and the legislators of the subject-matter; there is but one subject expressed in the title and so far as we are able to observe all sections of the Act are properly related thereto. It has been said that the word "subject" in said section indicates the thing about which the legislation is had, and the word "matters" the incident or secondary things necessary to provide for its complete enforcement. *Board* v. *Scanlan* (1912), 178 Ind. 142, 98 N. E. 801. The legislature of 1911 passed an act entitled, "An Act concerning intoxicating liquors." It was held in the foregoing case that this title was sufficient to embrace all other matters for the enforcement of the act. Other illustrations are: "An act concerning highways," *Smith* v. *Board* (1910), 173 Ind. 364, 90 N. E. 881; "An act concerning drainage," *Thorn* v. *Silver* (1910), 174 Ind. 504, 89 N. E. 943, 92 N. E. 161, 94 N. E. 753; "An act regulating descents and the apportionment of estates," *Stiers* v. *Mundy* (1910), 174 Ind. 651, 92 N. E. 374.

It is next contended by appellants that the act in question is in violation of Art. 1, Sec. 1, of the Indiana Constitution. This section is entitled "Natural Rights." If the act in question properly comes within the police power of the state then it is not in violation of said article and section. We do not believe it can successfully be asserted that the regulation of the supply of milk for human consumption does not come within the police power of the state. Every state in the Union, so far as we are advised, has exercised this power in relation to milk. For many years prior to the enactment of the act in question, this state has exercised this power. See sections 35-1202, -1203, -1301, -1302, -1303, -1304, -1305, -1312, -1313, -1314, -1317, -1319, -1322, Burns' Indiana Statutes, 1933 (§§8433, 8450, 8455, 8456, 8457, 8458, 8459, 8467, 8451, 8452, 8468, 2690,

2693, Baldwin's 1934). The police power of the state may be exercised to require that milk for human consumption be wholesome and healthful. *State* v. *Classer* (1912), 179 Ind. 230, 99 N. E. 1057. *Pacific Coast Dairy* v. *Police Court* (1932), 214 Cal. 668, 8 Pac. (2nd) 140, 80 A. L. R. 1217, and annotated notes. And it may also be exercised to secure a supply of milk sufficient to meet the needs of the people. As said in the case of *Wallace* v. *Feehan* (1933), 206 Ind. 522, 190 N. E. 438, "It is generally recognized that the preservation of the food supply is a proper subject of legislative action and laws enacted for that purpose will be upheld when they are reasonably appropriate and calculated to result in protection of the food supply against loss or destruction." In the case of *Nebbia* v. *People of State of New York* (1934), 291 U. S. 502, 54 S. Ct. R. 505, in discussing the Milk Control Act of New York, the court said: "Appellant insists that it went beyond the limits fixed by the Constitution. Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute, for government can not exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest."

So whatever rights the individual has under Art 1, Section 1, the public has the right, through the legislature, to regulate it for the benefit of the common interest of all, and when this is done, there is no violation of said article and section. In the instant case no rights of the appellants were invaded under said section. The appellant, in his brief, says: "The

business of producing, purchase, processing, sale and distribution of milk is not a business 'affected with a public interest,' and is not, therefore, subject to regulation as to the general policy of carrying on the business having no relation to the public health, safety, morals or general welfare it is unconstitutional and void." If the milk supply of the state is not affected with a public interest and has no relation to public health and the general welfare of our people, then, of course, the act would be invalid. But it is of common knowledge that the milk supply is affected with a public interest and has a direct relation to public health and the general welfare of the people. It is judicially known that milk and its by-products is a food absolutely essential to thousands of our citizens in order to sustain life, and if the supply was cut off for only a few days no one could foretell the dire calamity that would follow. Appellants were certainly not serious in making the above contention.

It is further insisted by appellants that the Act is in violation of Section 11, Article 1, of the Constitution of Indiana, which provides that the right of the people to be secure in their persons, homes, papers, and effects, against unreasonable search or seizure, shall not be violated. Section 5 of the Act provides that the Milk Control Board is invested with power "to have access at all reasonable hours to enter any place where milk is being produced, processed, stored, bottled or sold. Such power may be exercised by any member of the board or any employee designated for the purpose and any such member or designated employee shall also have power, upon order of the board, to inspect all pertinent and material books, papers, records or documents at any place within the state for the purpose of ascertaining facts to enable the board to administer this act." This provision is not in conflict with

said Article and Section, *supra*. As stated, the provision is for the purpose of ascertaining facts to enable the board to administer and enforce the Act. It is not unreasonable to have an inspection of the place where milk is being handled in any form, and we have had in this state for many years milk inspection laws which are essential to the producing of pure and sanitary milk. Without such power of inspection our sanitary milk law would be useless and ineffective.

It has been decided by this court that proper officers shall have access to records and books of tax payers for the purpose of assessing property and that such inspection and examination is not in violation of Section 11, Article 1, *supra; Washington National Bank* v. *Daily* (1906), 166 Ind. 631, 77 N. E. 53. And, moreover, the act in question comes within the police power of the state, and the legislature has the right to provide for inspection and examination as it did. Such was in the interest of the public. *Shuman* v. *City of Fort Wayne* (1891), 127 Ind. 109, 26 N. E. 560.

Section 6 of said Act provides that "Any person who violates any of the provisions of this act, or of any lawful rule or order of the board, shall be liable in the penal sum of not to exceed one thousand dollars. Each day's violation of any such provision, order or regulation shall constitute a separate offense." It is claimed that this provision offends the 14th Amendment to the Federal Constitution and also Section 12, Article 1, of the Indiana Constitution in that the penalty is so disproportionate to the offense as to intimidate any person from contesting the law because of the consequences which might be inflicted if unsuccessful and without due process. Section 6 of the Act is for the purpose of making the act effective. As said in the case of *Republic Iron & Steel Co.* v. *State* (1902), 160 Ind. 379, p. 383, 66 N. E. 1005: "No act of the legislature can be made effec-

tive without some reasonable provision for its enforcement, and the assessment of a penalty for noncompliance has long and many times been recognized by the General Assembly and the courts of this state as an efficient and reasonable means of securing obedience." We can not say that the penalty as provided is so severe as to intimidate one from resorting to the courts to test the validity of the act. "The fixing of punishment for crime or penalties for unlawful acts against its laws is within the police power of the state. We can only interfere with such legislation and judicial action of the state enforcing it if the fines or penalties are so grossly excessive as to amount to a deprivation of property without due process of law." *Waters-Pierce Oil Co.* v. *Texas* (1909), 212 U. S. 86, p. 111, 29 S. Ct. R. 220. The penalties provided for in the act are not so excessive as to amount to a deprivation of property without due process of law.

It is said by the appellants that the act in question is void because it affects to deprive appellants of the right to a trial by jury. We do not so construe the act. If the action is for the penalty, a jury may be had if requested. If it is a mandamus action a jury may be had if requested. If it is an injunction proceeding, then it would be tried by the court, as all injunction actions are.

It is further alleged by appellants that the act is void for the reason that it takes appellants' property without compensation and without due process of law, and is class legislation. Under this proposition the appellants especially attack sections 5, 6, 7, and 8 of the act.

The regulation of the sale of milk for human consumption is a proper exercise of the police power of the state, and such regulation does not amount to the taking of private property without compensation in violation of Section 21, Art. 1, of the State Constitution.

As heretofore stated, the milk business is affected with a public interest and is subject to reasonable regulations, and "When the sovereign people of a state, acting through the legislature, find such police regulations necessary to protect public health, safety or morals, to prevent fraud or oppression, or to promote the general welfare, the power to act is supreme, subject only to such limitations as are imposed by the fundamental law. The question as to what regulations are proper and needful is primarily for legislative decision, yet when the police power is used to regulate a business or occupation which in itself is lawful and useful to the community, the courts, if called upon, must determine finally whether such regulations as may have been prescribed are so far just and reasonable as to be in harmony with constitutional guaranties." *State* v. *Richcreek* (1906), 167 Ind. 217, 222, 223, 77 N.E. 1085; *Republic Iron & Steel Co.* v. *State, supra.*

"It was held in the case of *City of Aurora* v. *West* (1857), 9 Ind. 74, 83, that it is only the taking of specific pieces of private property by the exercise of the power of eminent domain, without compensation, that is prohibited by §21, article 1, of the State Constitution, . . ." and that this constitutional provision was not intended to serve as a restraint upon the exercise of the police power of the state for the public welfare. *State* v. *Richcreek, supra.* It is declared in Section 1 of the act that "milk is a necessary article of human food; that the procurement and maintenance of an adequate supply of milk of proper chemical and physical content, free from contamination, is vital to the public health and welfare, and that the production, transportation, processing, storage, distribution and sale of milk, in the State of Indiana, is a business affecting the public health and interest; that unfair, unjust, destructive and demoralizing trade practices have been and are now

being carried on in the production, sale, processing and distribution of milk, which constitute a constant menace to the health and welfare of the inhabitants of this state and threaten the economic integrity of the milk industry." Such was part of the declared policies of the legislature in relation to the milk industry and with this in view the act was enacted regulating the industry. We find nothing in the act incompatible or unjust and unreasonable as not to be in harmony with the constitutional guaranties as contained in Section 21 of Art. 1 of the State Constitution. Nor do we agree that it violates Art. 14 of the Amendments to the Constitution of the United States. In speaking of this amendment Judge Harlan in the case of *Mugler* v. *Kansas* (1887), 123 U. S. 623, 8 S. Ct. R. 273, said: "It can not be supposed that the states intended, by adopting that amendment, to impose restraints upon the exercise of their powers for the protection of the safety, health or morals of the community.... The principle, that no person shall be deprived of life, liberty, or property, without due process of law, was embodied in substance, in the constitutions of nearly all, if not all of the states at the time of the adoption of the 14th amendment; and it has never been regarded as incompatible with the principle, equally vital, because essential to the peace and safety of society, that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community."

In the case of *Barbier* v. *Connolly* (1885), 113 U. S. 27, 31, 5 Sup. Ct. Rep. 357, Judge Fields, in speaking of the 14th Amendment, said: "The fourteenth amendment, in declaring that no state 'shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but

that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid under one than are laid upon others in the same calling and condition, and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses. But neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity. . . . Regulations for these purposes may press with more or less weight upon one than upon another, but they are designed, not to impose unequal or unnecessary restrictions upon anyone, but to promote, with as little individual inconvenience as possible, the general good. Though, in many respects, necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all

persons similarly situated, it is not within the amendment."

The appellants claim that the act is void for the reason that the board is granted the authority to fix the time it shall take effect in violation of Section 25, Art 1 of the Constitution of Indiana. Section 7 of the Act provides: "Within thirty days after this act takes effect, or within such extended time as the board by general rule may prescribe, or before commencing business, each milk dealer, as defined in this act, shall apply to the board for a license to engage in business as a distributor, a producer-distributor, a distributing broker, or to conduct a retail store, as defined in this act, or in any one or more of said businesses, provided that each applicant shall apply for a license for each business in which he intends to engage . . ." Appellants can not be serious as to this contention. There was an emergency clause to the act which provided for the immediate taking effect of the act at the time of its passage. The act was in full force and effect at the time of its passage, and that part of section seven as set out, was for the benefit of those desiring to come within the act to have sufficient time within which to obtain a license as provided. *School City of Marion* v. *Forrest* (1907), 168 Ind. 94, 78 N. E. 187; *Isenhour* v. *State* (1901), 157 Ind. 517, 62 N. E. 40.

It is also contended by appellants that the act attempts unconstitutional delegation of legislative authority to the Milk Control Board. We do not agree with this contention. The act does not pretend to delegate legislative power. The character and nature of the Milk Board is administrative only, and the power given to the board, under the act, has been held to be legal and not unconstitutional in many cases similar to the instant. The power given to the State Board of Health is similar to the power given to the Milk Con-

trol Board, and it was contended in the case of *Blue* v. *Beach* (1900), 155 Ind. 121, 56 N. E. 89, that the power given was a delegation of legislative authority in violation of Section 1, Art. 4 of the Indiana Constitution. In passing upon this question, the court said (p. 132): "It can not be successfully asserted that the power of boards of health to adopt rules and by-laws subject to the provisions of the law by which they are created, and in harmony with other statutes in relation to the public health, in order that the 'outbreak and spread of contagious and infectious diseases' may be prevented, is an improper delegation of legislative authority, and a violation of article 4, §1 of the Constitution. It is true beyond controvery that the legislative department of the state, wherein the Constitution has lodged all legislative authority, will not be permitted to relieve itself of this power by the delegation thereof. It can not confer on any body or person the power to determine what the law shall be, as that power is one which only the legislature, under our Constitution, is authorized to exercise; but this constitutional inhibition can not properly be extended so as to prevent the grant of legislative authority, to some administrative board or other tribunal, to adopt rules, by-laws, or ordinances for the government of or to carry out a particular purpose. It can not be said that every grant of power to executive or administrative boards or officials, involving the exercise of discretion and judgment, must be considered a delegation of legislative authority. While it is necessary that a law, when it comes from the law-making power, should be complete, still there are many matters relating, to methods or details which may be, by the legislature, referred to some designated ministerial officer or body. All of such matters fall within the domain of the right of the legislature to authorize an administrative board or body to adopt ordinances, rules, by-laws, or regula-

tions in aid of the successful execution of some general statutory provision. Cooley Const. Lim. 114."

The rule in respect to the delegation of legislative power is well stated in Locke's Appeal (1873), 72 Pa. St. 491, 498, as follows: "Then, the true distinction, I conceive, is this: The legislature can not delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which can not be known to the lawmaking power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation."

It is further stated on p. 133 in the case of *Blue* v. *Beach, supra,* "That the power granted to administrative boards of the nature of boards of health, etc., to adopt rules, by-laws, and regulations reasonably adapted to carry out the purpose or object for which they are created, is not an improper delegation of authority within the meaning of the constitutional inhibition in controversy, is no longer an open question, and is well settled by a long line of authorities." Many authorities cited.

In the case of *State* v. *Newark Milk Co.* (1935), 118 N. J. E. 504, 179 Atl. 116, in discussing the milk control act of that state, which is very similar in every respect to the act under consideration, in relation to the powers of the board, the court said (p. 521): "The plainly expressed legislative object is the maintenance of a price level that will yield only a reasonable return for the producer's labor and investment, and thus insure an adequate supply of wholesome milk. To the administrator agency is committed the effectuation of this definitely expressed policy, soundly based in economics, to preserve the vital

food industry by the maintenance of this price level. Such is the extent and limit of its authority. There is therefore no delegation of the exclusive legislative function. The statute is complete in itself. There is obviously no attempt to vest in the respondent board authority that is essentially legislative. It reposes in it the administrative function only, and this was concededly within the competency of the legislature."

The appellants object especially to the powers given under section 5 of the act in which the Milk Control Board is given power to (a) supervise the milk industry of the state; (b) to have access to enter any places where milk is being produced; (c) to determine a natural marketing area; (d) to adopt, enforce rules and regulations governing the proposition of the product of the entire herd of a producer which shall be accepted and paid for pursuant to such price as may be established by the board; (e) to establish reasonable trade practices between producers and distributors; (f) to regulate the marketing of milk at wholesale or retail in any marketing area, and (g) to determine the minimum prices to be paid by all licensed milk dealers for such classification of milk produced and furnished for consumption in any marketing area.

In our judgment none of the powers given the Milk Control Board under section 5 of the act are beyond the powers of the legislature, and are not an unconstitutional delegation of that power. Practically the same powers were given to the milk board under the New York act, and the Supreme Court of the United States, in the case of *Nebbia* v. *People, supra,* held the act to be valid and in reference to the fixing of a minimum price, using the following language: "It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amend-

ments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. *Wolff Packing Co.* v. *Court of Industrial Relations,* 262 U. S. 522, 535, 43 S. Ct. 631, 67 L. Ed. 1103, 27 A. L. R. 1280. The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. In several of the decisions of this court, wherein the expressions 'affected with a public interest,' and 'clothed with a public use,' have been brought forward as the criteria of the validity of price control, it has been admitted that they are not susceptible of definition and form an unsatisfactory test of the constitutionality of legislation directed at business practices or prices. These decisions must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells. . . ."

"The lawmaking bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by

the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.

"Tested by these considerations we find no basis in the due process clause of the Fourteenth Amendment for condemning the provisions of the Agriculture and Markets Law here drawn into question." In the case of *Borden* v. *Ten Eyck*, 297 U. S. 251, 56 S. Ct. 453, decided by the U. S. Supreme Court February 10, 1936, the court affirmed the Nebbia case to the right of the board to fix the price of milk.

The Nebbia case was first decided by the Court of Appeals of New York (1933), 262 N. Y. 259, 265, 186 N. E. 694, and then appealed to the Supreme Court of the United States, where the judgment of the lower court was affirmed. Judge Pound of the New York Court of Appeals wrote the opinion of that court. Among other things he said: "The production of milk is, on account of its great importance as human food, a chief industry of the state of New York. . . . It is of such paramount importance as to justify the assertion that the general

welfare and prosperity of the state in a very large and real sense depend upon it. The entire milk product can not be sold locally. It must be sold to milk gatherers to be shipped to centers of population. Distributors buy the milk from the farmers. The purchaser is compelled to take what the shipper offers. The shipper offers a low rate at which milk can not profitably be produced. The state seeks to protect the producer by fixing a minimum price for his milk to keep open the stream of milk flowing from the farm to the city and to guard the farmer from substantial loss. . . . Price is regulated to protect the farmer from the exactions of purchasers against which he can not protect himself. . . . Doubtless the statute before us would be condemned by an earlier generation as a temerarious interference with the rights of property and contract; . . . with the natural law of supply and demand. But we must not fail to consider that the police power is the least limitable of the powers of government and that it extends to all the great public needs; that constitutional law is a progressive science; that statutes aiming to establish a standard of social justice, to conform the law to the accepted standards of the community, to stimulate the production of a vital food product by fixing living standards of prices for the producer, are to be interpreted with that degree of liberality which is essential to the attainment of the end in view. . . . And that mere novelty is no objection to legislation."

It is stated by appellants that the appellee is not authorized to maintain the suit. We think it is. It is specifically declared in section 5 that the Milk Control Board is an instrumentality of the state for the purpose of enforcing the act. In clause 7 of section 6 it is declared that "the board shall have power to enforce any provision of the act, or any provision of any rule or order of the board by injunction, mandamus

or any appropriate remedy." Also in clause 26, section 5, it is provided "In all cases where an order of the board is appealed from and in all cases to be commenced by the board . . ." See *In re Burk* (1918), 66 Ind. App. 435, 118 N. E. 540.

The board has a legal existence and entity, and has both express and implied power to sue.

In section 1 of the act it is declared that the conditions surrounding the production of milk for human food has created an emergency which requires immediate correction. Section 25 declares the emergency period to be between the time the act takes effect and until July 1, 1937, and that the provisions of the act shall apply only during this period, unless the legislature shall otherwise provide.

The appellants contend that emergency has ceased to exist, and therefore, the law is no longer operative.

In the milk control law of New Jersey the legislature invoked the police power to enact what it declared to be an "emergency law, necessary for the immediate preservation of the public peace, health and safety." In that act (1933) it was provided that it should expire July 1, 1935. The act was upheld in the case of *State* v. *Newark Milk Co., supra,* and the court, among other things, said (p. 518) : "But, as was pointed out in the case of *Nebbia* v. *New York, supra,* the legislature is primarily the judge of the necessity of the law, and every possible presumption in favor of its validity will be indulged ; and 'though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.' While the finding by the legislature of the existence of conditions requiring such regulation, in the exercise of the police power, is subject to judicial review, we find no basis, in the present posture of the case, for the notion that this measure is an arbitrary or capricious exercise of legislative

power. . . . In the instant case, the exertion of legislative power was predicated upon a finding of immediate danger to the public health and welfare, and the consequent urgency of public supervision. And . . . the statute is entirely reasonable in its terms; there was no arbitrary action. The legislation is addressed to a legitimate end; and the measures taken are reasonable and appropriate to that end."

We do not think it is for this court to say that the emergency has passed, and that therefore the act must become inoperative now instead of July 1, 1937, the time fixed for its expiration by the legislature. We can not say that the legislature acted capriciously and arbitrarily in finding there was an emergency or in fixing the time for the act to expire. The legislature of 1937 may, for all we know, extend the period as was done by the legislature of New Jersey in 1935, in extending its 1933 milk control law. It is declared in section 1 of the act that "unfair, unjust, destructive and demoralizing trade practices have been and are now being carried on in the production, sale, processing and distribution of milk, which constitute a constant menace to the health and welfare of the inhabitants of this state and threaten the economic integrity of the milk industry." If, as the legislature found, there were unfair, unjust, destructive and demoralizing trade practices in the milk industry, and the act was passed to regulate these practices, this court can not say that the term or period fixed by the legislature to correct the practices is an unreasonable or arbitrary one. It was the destructive practices that created the emergency, and it is proper for the legislature to fix a reasonable time in which to correct and regulate the industry when the emergency will cease to exist.

We do not consider that the National Agricultural Adjustment Act has anything to do with the act in the

instant case as contended by appellants. Although this act was declared void, we have the decision of the same court, *Nebbia* v. *People, supra,* upholding the Milk Control Act of New York which is similar and in many respects identical with the act in question, and also the case of *State* v. *Newark Co., supra.*

Subdivisions. 21 and 27 of section 5 are attacked as being invalid. Subdivision 21 provides that within thirty days after service of any order or decision of the board any person affected by such rule, regulation, order or decision may appeal. to the circuit or superior court of any county in which the subject-matter of the hearing is situated. Such court has jurisdiction to reverse, vacate or modify the order complained of, if, upon consideration of the record before the board, the court is of the opinion the order was unlawful or unreasonable. No new or additional evidence shall be heard by the court, but judgment shall be rendered on the record filed by the board. If new evidence is discovered by any party after the hearing by the board, it may be presented the same as a motion for a new trial.

Subdivision 21 does not undertake to empower the courts to control administrative or legislative discretion conferred upon the Milk Control Board. The effect of the subdivision, as we interpret it, is to give to the courts the powers to pass upon the reasonableness of any orders made by the board and to decide whether or not the same are lawful. This the courts have power to do. *In re Northwestern Indiana Tel. Co.* (1930), 201 Ind. 667, 171 N. E. 65; *Public Service Commission* v. *City of Laporte,* (1935), 207 Ind. 462, 193 N. E. 668.

Subdivision 27 of section 5 provides that from the final judgment or decree of the circuit or superior court entered upon any appeal taken from it, an appeal may be taken to the Appellate Court of Indiana under the rules governing such appeals in civil

cases, except that if the Appellate Court does not render its decision within ninety days after the transcript of the record therein is filed with it, such judgment or decree so appealed from shall be conclusively deemed to be affirmed.

Under the foregoing section, an appeal having been provided for in certain cases to the Appellate Court, we do not think the legislature had the power to, in effect, compel the court to decide the case within ninety days. There must be an orderly procedure in the disposition of appealed cases, and to say that one class of cases must be decided within a specified time, and by failure to do so the judgment below must be considered affirmed, is an arbitrary and capricious classification. The act gives a right to appeal, and after one appeals and incurs the expense thereof, he should not be deprived of the right to have his appeal disposed of in the regular manner because of the failure of the court, for one reason or another, to decide it within ninety days.

Section 24 of the act provides that if any clause, sentence or part of the act be adjudged invalid, such judgment shall not affect or invalidate the remainder of the act. The ninety day provision is clearly severable, and its effectiveness does not invalidate the validity of the remainder of subdivision 27 or the act as a whole. Subdivision 27 must be construed as giving an appeal without limitation of time when a decision shall be rendered.

The appellee assigned three cross-errors which are as follows: 1. The court erred in overruling appellee's motion to strike out the cross-complaint of appellants. 2. The court erred in overruling the appellee's demurrer to the cross-complaint of appellants. 3. The court erred in overruling appellee's motion to modify the judgment, order and entries made and rendered by the court on August 23, 1935.

While most, if not all, of the questions raised in the

cross-complaint were presented and urged by appellants in their demurrer and answer to the complaint, yet there was no error committed by the court in overruling the motion to strike out the cross-complaint, and in overruling the demurrer thereto. The cross-complaint stated facts sufficient to withstand a demurrer. There was nothing to have prevented the appellees from dismissing their complaint before trial, and in that event the appellants would have had the right to present the issues made upon the cross-complaint.

The appellee, in answer to the cross-complaint of appellants, admits and concedes that with respect to milk produced and purchased, and the title to which is acquired by Indiana dealers in states other than Indiana for sale within the State of Indiana, appellee concedes that it can not prescribe, fix or regulate the minimum price to be paid to the producers of such milk. The case of *Baldwin* v. *Seeling* (1935), 294 U. S. 511, 55 S. Ct. R. 497, compels this admission and concession. The lower court found and decreed, as admitted and conceded by appellee above, that with reference to milk produced in states other than Indiana, the appellee had no power to prescribe, fix or regulate the minimum price to be paid to the producers of such milk. The court further found and decreed, upon the cross-complaint, that in all other respects the specifications sought to be held unconstitutional are constitutional.

The lower court overruled appellants' motion for a new trial, and fixed an appeal bond in the sum of four hundred ($400) dollars to be filed within fifteen (15) days, and then added, "And if such bond is filed within said time and the appeal thereafter duly prosecuted, during such period of appeal the injunction herein entered shall be suspended provided that the said defendants and each of them comply with all lawful regulations and orders of the said plaintiff ap-

plicable generally to the business of the defendants."

The appellees filed a motion to modify the judgment by striking out the part of the entry above quoted.

It is true, as admitted by appellants, that the taking of an appeal does not suspend the injunction. "An appeal does not vacate an injunction nor authorize its disobedience. Until reversed the appeal is effective and must be obeyed." *Hawkins* v. *State* (1890), 126 Ind. 294, 297, 26 N. E. 43; *Cadwell* v. *Teaney* (1928), 199 Ind. 634, 157 N. E. 51.

In the instant case, however, there was, in effect, no real suspension. It was only suspended on the condition that the appellants complied with all lawful regulations and orders of the milk board applicable generally to the business of the appellants. Under such a suspension no possible harm could be done and no error was committed by the court in its refusal to modify the entry.

As heretofore stated, the milk control act of Indiana is very similar, and, in many respects, identical with the milk control acts of New York and New Jersey. Doubtless, the authors of the Indiana act had these acts before them when they wrote the Indiana act, and followed them to a large extent. The New York act has been held, in the case of *Nebbia* v. *People, supra,* constitutional by the Supreme Court of the United States, and the New Jersey act, in the case of *State* v. *Newark, supra,* has been held unconstitutional. While all the questions presented in the instant case were not presented in those cases, the fundamental principles are the same in all—the power of the legislature to regulate and control the production, transportation, processing, storage, distribution and sale of milk for human consumption.

We have not quoted at length from the New York and New Jersey cases. To have done so would have unduly extended this opinion. The New York case was.

decided by the highest judicial tribunal of our land. These decisions alone are sufficient to justify the affirmance of the instant case. We are satisfied that no federal or state constitutional provision questioned by appellant is violated in the instant case and we find no available error.

Judgment affirmed.