Argued May 10; reargued September 8; affirmed
November 22, 1938

# STATE ex rel. VAN WINKLE v. FARMERS UNION COOPERATIVE CREAMERY OF SHERIDAN, OREGON

(84 P. (2d) 471)

*Leland S. Duncan,* of McMinnville, for appellant.

*Oscar Hayter,* of Dallas (I. H. Van Winkle, Attorney General, on the brief), for respondent.

BAILEY, J. This suit was instituted in the name of the state of Oregon, on the relation of the attorney general, I. H. Van Winkle, against Farmers Union Cooperative Creamery, a corporation of Sheridan, Oregon, to restrain the defendant from

"(1) Buying or receiving from the producers thereof any cream for any commercial use or purpose until such time as the defendant shall (a) maintain at each creamery, receiving station or other place where such cream is received, a cream grader duly licensed as such under chapter 279, Oregon Laws 1937, and qualified to grade cream in accordance with the official grades and standards established by the state department of agriculture pursuant to said chapter 279, and (b) post and keep posted in a conspicuous place at each creamery or other place where cream is received by or for it the price differential between the grades of cream received by it; and

"(2) Making or maintaining to the producers of different grades of cream bought or received from such producers for any commercial use or purpose the same price per pound of butterfat content."

From a decree granting to the plaintiff the full relief prayed for in the complaint except costs and disbursements, the defendant has appealed.

Chapter 279, Oregon Laws 1937, provides that the state department of agriculture shall establish official grades and standards of quality and condition appli-

cable to all milk and cream, except milk and sweet cream sold in fluid form for human consumption, purchased or obtained from the producer thereof for any commercial use or purpose. It further provides that any person who shall buy or receive any such milk or cream from the producer thereof shall cause the same to be graded at the time and place of receiving it, by a competent grader or graders employed by the person buying or receiving the milk or cream, who shall be licensed as such grader or graders by the state department of agriculture; that a full and complete record of such grading shall be kept; and that "any person buying or receiving two or more such grades of milk or cream from the producer thereof for any commercial use or purpose shall make and maintain to the producer a price differential between each grade of not less than one cent per pound of butterfat content." The amount of said differential and the price currently paid or offered for each of the various grades of milk or cream are required to be kept posted by the buyer in a conspicuous place in each creamery or receiving station where such milk or cream is bought or received.

The act further requires that the official state consumer grades for butter sold and distributed within the state shall be grades A, B, and C; that the state department of agriculture shall establish, prescribe and promulgate "reasonable definitions and standards of quality and condition governing the use and application of each of said grades and the classification of butter thereunder"; and that every butter manufacturer or butter distributor selling or distributing butter to any consumer or retailer shall maintain one or more butter graders licensed by the state department of agriculture.

The 1937 act became effective, by virtue of an emergency clause, immediately upon being filed with the secretary of state on March 8, 1937. On or about May 16 of that year the state department of agriculture, pursuant to the provisions of the said act and after notice and hearing, established and promulgated standards and grades for milk and cream to be used for manufacturing purposes, and consumers' grades and standards for butter. Three grades of milk were established, to-wit: first grade, second grade and unlawful milk. Four grades of cream were established, known as A grade, B grade, C grade and unlawful cream. For butter four grades were provided, known as A grade, B grade, C grade and unlawful butter.

It is the contention of the defendant that the provisions of this act which require the employment of licensed graders, the grading of milk and cream and the keeping of records of such grading are unconstitutional and void as applied to the defendant's operations, in that the act forces the defendant to pay out "large sums of money therefor, without any resulting benefit to it or to the public in general, thus amounting to taking" its property without due process of law, in contravention of the fourteenth amendment of the constitution of the United States. The defendant further argues that that part of the law which requires the payment of a price differential of at least one cent per pound of butterfat content between different grades of milk and cream is likewise unconstitutional, for the reason that it interferes with and impairs the obligation of contracts between the defendant and its members and patrons, by preventing the defendant from returning to such members and patrons the exact amount which it has agreed and covenanted to return,

in direct conflict with section 10 of article I of the constitution of the United States and section 21 of article I of the constitution of the state of Oregon.

The defendant creamery was organized under the laws of the state of Oregon in 1932 as a non-profit co-operative corporation. Its place of business is at Sheridan and it is engaged principally in the manufacture of butter. A small amount of ice cream is also manufactured by the defendant. It receives cream from approximately eight hundred fifty producers, a large number of whom are members of the association. These producers are located in Yamhill, Polk, Lincoln and Tillamook counties.

When the cream is received, title to it passes to the defendant company. At the end of each month the income and expenses of the defendant for that month are estimated, and on or about the tenth of the following month the defendant makes a payment, termed an "advance", to each of the producers, based on the number of pounds of butterfat contained in the cream delivered by each producer. This advance is made regardless of the grade of cream delivered. In other words, the price paid for A grade cream is the same as that paid for B or C grade. At the end of the year final settlement is made with all the producers, whether members or not, by distributing to them in proportion to the amount of butterfat delivered by each during the year the accumulated surplus of earnings, paid either in cash or certificates of interest in undistributed working capital.

At the time chapter 279, *supra*, became effective many of the producers were under written contract with the defendant company to deliver their cream to it, pursuant to an understanding that they were to be

paid on the basis of amount of butterfat content delivered, regardless of the grade of such cream. The constitution and by-laws of the defendant corporation, it is claimed, control the terms and conditions under which cream is received by the defendant from producers who have not entered into written contracts with reference to delivery of cream. No distinction is made between prices paid to those who are under contract with the defendant company and those who are not.

The statute here under review does not require the milk and cream of different grades, after the grades have been determined, to be kept segregated in separate containers. Nor does it require that in processing milk and cream certain grades thereof shall be used in making butter, ice cream or any other product. In other words, after the defendant corporation has received cream from its various patrons and graded it according to the rules and regulations promulgated by the state department of agriculture, it may then use such cream, except that graded as unlawful, in any manner that it sees fit. There is no requirement that in the manufacture of grade A butter, for example, only grade A cream or any certain percentage of such cream shall be used. This is also true of the manufacture of other grades of butter.

The evidence introduced, however, is overwhelmingly to the effect that not to exceed ten per cent, or at the most fifteen per cent, of grade B cream can be successfully mixed with grade A cream in making grade A butter. Some of the witnesses testified that it would not be safe to use any grade B cream at all in making grade A butter. As a witness, Mr. Jones, manager of the defendant's dairy, testified that fifty to sixty per cent of grade B cream might be used in

making grade A butter. There is also evidence to the effect that the amount of B grade cream which can be used in the manufacture of grade A butter depends to some extent upon the exactness of the grader of the cream, and that if B grade cream is just under the requirements of grade A cream, a larger percentage of such B grade cream can be used in the manufacture of grade A butter. There appears to be a very small amount of grade C cream received by dairies throughout the state, and, according to a number of witnesses, this grade of cream is not used at all in the manufacture of butter.

Butter is graded entirely upon its own qualities as a completed product, without reference to the butter grader's knowledge of the grade of cream used in its manufacture. As a general rule, grade A cream almost invariably produces grade A butter, although sometimes, due to the inefficiency of the buttermaker, or from other causes, grade B butter is produced from grade A cream.

There is no contention made by the plaintiff that the defendant has not complied with the provisions of the statute with which we are here concerned, as to grading the butter which it manufactures, and employing duly licensed butter graders for that purpose.

■ In passing upon the question of whether the act here involved violates the provisions of either the United States or the state constitution, we should bear in mind that the constitutionality of the state enactment is on a different footing from that of an act of Congress. The federal government, while possessing plenary authority within its allotted sphere or province, is one of delegated powers, and the inquiry respecting a federal statute is whether Congress, by ex-

press provision or necessary implication, has been given authority to legislate on the subject under consideration and to pass the act in question. As respects a state statute, the inquiry is whether the state legislature has been forbidden, either by the federal constitution or the organic law of the state, to legislate on the subject and to enact the law in question.

The legislature of this state is not expressly prohibited, either by the constitution of the United States or that of the state of Oregon, from enacting the statute with which we are here concerned. The case, therefore, narrows down to an inquiry as to whether such legislation is impliedly forbidden by the provisions of the constitution of the United States or those of the Oregon constitution, on which the defendant relies.

The plaintiff argues that the state of Oregon has an inherent right under its police power to enact and enforce this legislation, and in support of this contention many authorities are cited which uphold legislation enacted in the public interest even though such law or laws may interfere with individuals' rights to contract.

In referring to the police power of a state, the supreme court of the United States in *Nebbia v. New York*, 291 U. S. 502 (78 L. Ed. 940, 54 S. Ct. 505, 89 A. L. R. 1469), observed:

"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government can not exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private

right is that of the public to regulate it in the common interest. As Chief Justice Marshall said, speaking specifically of inspection laws, such laws form 'a portion of that immense mass of legislation, which embraces everything within the territory of a state, . . . all which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, . . . are component parts of this mass.'

"Justice Barbour said for this court: '. . . it is not only the right, but the bounden and solemn duty of a state, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation, which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called *internal police*, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive.' "

The court then quotes with approval from the opinion of Chief Justice Taney in *License Cases*, 5 How. 504, as follows:

" 'But what are the police powers of a state? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a state passes a quarantine law, or a law to punish offences, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same power; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates; and its authority

to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the constitution of the United States.'"

Further on in the opinion in the Nebbia case the court, in referring to due process of law, states:

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislative arm, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio*."

The Nebbia case involved the constitutionality of a New York law creating a milk control board with power, among other things, to fix minimum and maximum retail prices to be charged by stores to consumers for milk "for consumption off the premises where sold". Before the enactment of that law the legislature made a thorough investigation of the milk supply situation in that state and determined that an emergency existed, requiring the enactment of the legislation in question in order to insure an adequate supply of wholesome milk to residents of the state of New York. The law was passed in 1933 and the board was to continue with all the powers and duties specified by the act until March 31, 1934, at which date it was to be deemed abolished. By subsequent legislation, however, the powers of the board have been continued for a limited period.

The highest court of the state of New York and the United States supreme court both held that the legislation was constitutional. Much of the reasoning of the supreme court of the United States in upholding the law is based on the emergency found by the New York legislature to exist with reference to the milk supply in that state. What we have quoted, however, from the decision of that court in relation to the police power of a state is not limited to situations involving a present emergency.

Following the example of New York, many other states passed temporary legislation, based upon the declaration of a present emergency, creating milk control boards or commissions to regulate the milk industry and to fix prices at which milk should be sold. In most of, if not all, the states where the validity of such legislation has been attacked subsequent to the decision in the Nebbia case, the constitutionality of the act in question has been upheld. A list of the decisions in this connection may be found in the annotation in 110 A. L. R. at page 644.

The state of Oregon has also by legislation established a milk control board similar in many respects to that created by the New York law, with power to fix the price of milk. The Oregon legislation on this subject was enacted by the 1933 second special session and is found in chapter XX of title XLI, Oregon Code 1935 Supplement, comprising §§ 41-2001 to 41-2017, inclusive. That legislation had reference merely to milk and sweet cream sold for human consumption in fluid form. The constitutionality of the 1933 enactment is not here questioned.

The 1937 act, chapter 279, *supra*, was intended to supplement the law creating the milk control board and

to have reference to all milk and cream not theretofore placed under the control of that board, designated by the act as all milk and cream purchased or obtained from the producers thereof for any commercial use or purpose.

The 1937 enactment does not appear to have been passed to relieve a present emergency in the milk situation. Its duration is unlimited. In *Home Building & Loan Association v. Blaisdell*, 290 U. S. 398 (78 L. Ed. 413, 54 S. Ct. 231, 88 A. L. R. 1481), the court observed:

"While emergency does not create power, emergency may furnish the occasion for the exercise of power. 'Although an emergency may not call into life power which has never lived, nevertheless emergency may afford the reason for the exercise of a living power already enjoyed.' Wilson v. New, 243 U. S. 332, 348, 61 L. ed. 755, 773, 37 S. Ct. 298, L. R. A. 1917 E, 938, Ann. Cas. 1918 A, 1024."

■ We therefore must find some ground for upholdin the 1937 act other than that of a present emergency. The court of appeals of New York in *People v. Nebbia*, 262 N. Y. 259 (186 N. E. 694), speaking through Judge Pound, with reference to the milk industry said:

"The production of milk is, on account of its great importance as human food, a chief industry of the state of New York. * * * It is of such paramount importance as to justify the assertion that the general welfare and prosperity of the state in a very large and real sense depend upon it."

In *Albert v. Milk Control Board*, 210 Ind. 283 (200 N. E. 688), the supreme court of Indiana, in answering the contention that the business of producing, purchas-

ing, processing, selling and distributing milk is not a business affected with a public interest, said:

"If the milk supply of the state is not affected with a public interest and has no relation to public health and the general welfare of our people, then, of course, the act would be invalid. But it is of common knowledge that the milk supply is affected with a public interest and has a direct relation to public health and the general welfare of the people. It is judicially known that milk and its by-products is a food absolutely essential to thousands of our citizens in order to sustain life, and, if the supply was cut off for only a few days, no one could foretell the dire calamity that would follow. Appellants were certainly not serious in making the above contention."

Reverting again to the opinion of the United States supreme court in the Nebbia case, with reference to businesses affected with a public interest, we find therein this statement:

"It is clear that there is no closed class or category of business affected with a public interest, and the function of courts in the application of the fifth and fourteenth amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. Chas. Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 522, 535, 67 L. ed. 1103, 1108, 43 S. Ct. 630, 27 A. L. R. 1280. The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. In several of the decisions of this court wherein the expressions 'affected with a public interest,' and 'clothed with a public use,' have been brought forward as the criteria of the validity of price control, it has been admitted that they are not susceptible of definition and form an unsatisfactory test of the unconstitutionality of legislation directed at business practices or prices. These decisions

must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells.''

■ Chapter 279, *supra,* does not contain any pronouncement of the legislature as to the purpose of its enactment. Declarations of the legislature that certain facts exist which are deemed sufficient to support and justify the action taken by it are of aid when the constitutionality of an act is involved, but do not preclude judicial inquiry into the actual facts. In *United States v. Carolene Products Co.,* 304 U. S. 144, 82 L. Ed. 1234, 58 S. Ct. 778, the court, in speaking of the absence of such pronouncement, said:

''Even in the absence of such aids the existence of facts supporting the legislative judgment is to be presumed, for regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators.''

With further reference to judicial inquiry into the validity of legislation, it is therein said:

''But by their very nature such inquiries, where the legislative judgment is drawn in question, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed afford support for it. Here the demurrer challenges the validity of the statute on its face and it is evident from all the considerations presented to Congress, and those of which we may take judicial notice, that the question is at least debatable whether commerce in filled milk

should be left unregulated, or in some measure restricted, or wholly prohibited. As that decision was for Congress, neither the findings of a court arrived at by weighing the evidence, nor the verdict of a jury can be substituted for it.''

The production of milk is one of the chief industries of this state. It not only affects the health and welfare of the people, but has a direct bearing on the economic condition and general prosperity of Oregon.

In the case at bar there is evidence to the effect that the grading of cream and milk and the payment of a price differential according to grade have a tendency to raise the standards of milk and cream. There is further evidence to the effect that better grades of cream will produce better grades of butter and that when butter of better grade is produced the consumption of butter is increased within this state and the demand for it from outside the state rises.

■■ We cannot, therefore, conclude that there was not a ''rational basis within the knowledge and experience of the legislators'' which was deemed by them sufficient for the enactment of chapter 279, *supra*. Even if the question be debatable whether such regulation should be enacted, we cannot substitute our findings for the legislative judgment.

The defendant does not contend seriously, if at all, that the legislature does not have power to require the grading of milk and cream. Its objection is that the purpose of the law is to establish and enforce a price differential between various grades of cream and that such a law so far as it affects the defendant, a cooperative association, is unreasonable and arbitrary. The regulation of the marketing of farm and other products when the same enter largely into local and interstate

trade has been recognized as a legitimate exercise of the police power of the state, by many of the states of the union and even by the early colonies. This is forcefully brought out by the decision in the case of *Turner v. Maryland*, 107 U. S. 38 (27 L. Ed. 370, 2 S. Ct. 44). In the footnote to that case are cited many of the early laws relating to the inspection and regulation of farm and other products. See also, *Detweiler v. Welch*, 46 Fed. (2d) 75 (73 A. L. R. 1440).

■ It is said by the defendant that since the grader of cream and milk is to be employed by the receiver of those products, there is no assurance that the cream and milk received will be properly graded; in other words, that the grader will not be impartial in performing his work but will act to his employer's advantage. Probably no regulatory law is perfect, yet under chapter 279, *supra*, the grader must be examined and licensed by the state department of agriculture and his license is subject to revocation in the event that he does not honestly and impartially perform his duties. The legislature deemed that such grading would accomplish the result desired, and if the event proves otherwise, any defect in this respect can be remedied by future legislation. The possibility suggested by the defendant would not affect the constitutionality of the act.

■ It is further argued by the defendant that there is no relation between the grades of cream and the grades of butter produced therefrom, and that it is not necessary to use grade A cream exclusively in the manufacture of grade A butter, hence there is no necessity for requiring the defendant, which uses practically all the cream it receives in the manufacture of butter, to cause the cream received by it to be graded. There is, as already pointed out, a distinct relation between the

grades of cream and the grades of butter manufactured from them. The purpose of the law, however, is to encourage and reward the production of the highest quality of cream and milk, thereby effecting the improvement of one of the state's principal industries.

The defendant contends that because some grade B butterfat is used in the manufacture of grade A butter, and there must be a differential of at least one cent per pound between the prices paid for those two grades, the manufacturer of grade A butter is permitted to take an unfair advantage of the producer of B grade cream. In *Sproles v. Binford*, 286 U. S. 374 (76 L. Ed. 1167, 52 S. Ct. 581), it is said:

"To make scientific precision a criterion of constitutional power would be to subject the state to intolerable supervision hostile to the basic principles of our government and wholly beyond the protection which the general clause of the fourteenth amendment was intended to secure. Ohio Oil Co. v. Conway, 281 U. S. 146, 159. When the subject lies within the police power of the state, debatable questions as to reasonableness are not for the courts but for the legislature, which is entitled to form its own judgment, and its action within its range of discretion can not be set aside because compliance is burdensome."

■ The evidence in the case at bar is to the effect that grade A butter cannot be manufactured from grade B cream alone, and the mere fact that a small percentage of B grade cream may be used in the manufacture of A grade butter does not indicate that the law is unreasonable or arbitrary.

■ According to the record in the case there are ten to twelve cooperative creameries in the state, some larger and some smaller than the defendant organization. All such creameries except the defendant corpora-

tion are complying with the provisions of chapter 279, *supra,* and are not experiencing any difficulty in so doing. In addition to the cooperative creameries, the evidence discloses that all or practically all the independent creameries are complying with the law. Therefore, the objection to the law advanced by the defendant, that it is difficult of compliance, is not well founded. But even if the defendant does find it burdensome to obey the statute, that objection does not affect the validity of the act, as stated in the excerpt quoted from *Sproles v. Binford,* supra.

█ We find little merit in the defendant's contention that the law should not apply to it because it is doing a cooperative business and all the profits made by it are returned to the producers. As hereinbefore stated, one of the apparent purposes of the legislation is to encourage the development of better grades of dairy products. The law applies alike to cooperative and independent creameries. By its terms it refers to those that either buy or receive milk or cream from the producers. Failure of cooperative creameries to comply with the law would tend to break down its enforcement and defeat the purpose which the legislature had in mind.

The evidence is undisputed that there is in this state a prevailing price differential of one cent between grade A and grade B butterfat and that there is a larger differential between grade B and grade C butterfat.

In *Borden's Farm Products Co. v. Ten Eyck,* 297 U. S. 251 (80 L. Ed. 669, 56 S. Ct. 453), the constitutionality of the New York agriculture and markets law was attacked on the ground that the act allowed the less advertised dealers in milk and cream to charge one cent less per quart than those well advertised. After point-

ing out that such a differential existed prior to the enactment of the law, the court said:

"The appellant can not complain if, in fact, the discrimination embodied in the law is but a perpetuation of a classification created and existing by the action of the dealers. In the light of the facts found the legislature might reasonably have thought trade conditions existed justifying the fixing of a differential. Judicial inquiry does not concern itself with the accuracy of the legislative finding, but only with the question whether it so lacks any reasonable basis as to be arbitrary. Standard Oil Co. v. Marysville, 279 U. S. 582, 586-587."

Much reliance is placed by the defendant on the case of *Van Winkle v. Fred Meyer, Inc.*, 151 Or. 455 (49 P. (2d) 1140). The statute involved therein prohibited the sale of ice cream "at a price less than the minimum prescribed by a certain state ice cream marketing agreement". This court held that the act was an unlawful delegation of legislative power. That decision, when read in relation to the facts in the case, is not in conflict with what is here said in regard to the constitutionality of the act now under consideration.

The act assailed deals with an industry subject to regulation in the common interest. It is neither arbitrary, unreasonable nor discriminatory. It does not appear to have been enacted to accomplish any ulterior or improper purpose. In our opinion, chapter 279, Oregon Laws 1937, is constitutional, and therefore the decree appealed from is affirmed.

BEAN, C. J., and BELT, KELLY, ROSSMAN and LUSK, JJ., concur.

RAND, J., concurs in the result.