MARYLAND CO-OPERATIVE MILK PRODUCERS, INC., ET AL. *v.* C. WILBUR MILLER ET AL.
[No. 22, January Term, 1936.]

*Decided December 27th, 1935.*

The cause was argued, as of the October Term, before

BOND, C. J., URNER, OFFUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Philip B. Perlman,* with whom was *Laban Sparks* on the brief, for the appellant.

*Herbert R. O'Conor, Attorney General,* and *Charles G. Page, Special Attorney,* with whom was *William L. Henderson, Assistant Attorney General,* on the brief, for the appellees.

*McIntosh & Thrift,* submitting on brief, for A. D. Alexander and others, intervening defendants.

URNER, J., delivered the opinion of the Court.

Two affiliated corporations, known as Maryland Cooperative Milk Producers, Inc., and Maryland State Dairymen's Association, Inc., and three members of both organizations, are plaintiffs in this suit for an injunction to prevent the Maryland Milk Control Commission, and its members individually, from enforcing the provisions of the "Milk Control Law," enacted by chapter 310 of the Acts of 1935 of the General Assembly of Maryland. If the act is valid and effective, the plaintiffs are subject to regulation and control by the commission in their operations as milk producers and distributors. It is alleged in their bill of complaint that the act is unconstitutional and void. By the decree of the lower court the statute was sustained as a valid exercise of legislative power, and the bill of complaint was therefore dismissed. From that decree the plaintiffs have appealed.

The purposes of the challenged act are thus described in its title: "An Act to add a new Article to the Code of Public General Laws of Maryland, title 'Milk Control,' to follow Article 65 of said Code and to be known as Article 65-A; creating a Milk Control Commission; establishing its jurisdiction; powers and duties; regulating the production, transportation, processing, storage, distribution, delivery, and sale of milk; providing for the licensing of milk dealers and the issuing of permits to producers

and the payment of fees therefor; requiring distributors to furnish bonds or their cash equivalent or a satisfactory financial statement to secure payments to producers and all other payments authorized or required by the Commission; authorizing the examination of the business, papers, and affairs of, and requiring the filing of reports by milk dealers and producers, and permitting with limitations the dissemination of information obtained therefrom; authorizing the issuance of subpoenas by the Commission or its agents, and conferring jurisdiction upon courts to punish contempts or to prohibit violations of orders of the Commission; providing for appeals to the courts from decisions of the Commission; authorizing meetings and agreements between local groups of producers and distributors and between local groups of milk dealers; imposing penalties; repealing all laws inconsistent with the provisions of this Act; providing for its termination June 1st, 1937; declaring an emergency with respect to production and marketing of milk, and making the Act an emergency measure to take effect from the date of its passage."

Section 1 of the new Code article enacted under that title defines various terms which it employs. By section 2 the Maryland Milk Control Commission is created, and the method for the selection of its three members by the Governor is prescribed. The provisions of section 3 are in part as follows:

"The Commission, when requested by a substantial proportion of the producers and/or consumers and/or distributors in any marketing area, shall have power:

"(a) To supervise and regulate the entire milk industry in any marketing area established under sub-section (e) of this Section. The general power hereby conferred upon the Commission extends to the supervision and regulation of the production, processing, distribution and sale of the entire output of the lacteal secretion of dairy animals in this State to the extent that the same is available in the form of milk as defined by this Act. * * *

"(b) To investigate all matters pertaining to the pro-

duction, transportation, processing, storage, distribution and sale of milk in this State. For the purpose of such investigation or any hearing which the Commission is authorized or required to conduct, the Commission or any member thereof, and its executive secretary shall have power to administer oaths, take depositions, issue subpoenas, compel the attendance of witnesses and the production of books, accounts, papers, records, documents and testimony. * * *

"(c) To have access to and at all reasonable hours enter any place where milk is being produced, transported, processed, stored, bottled or sold. * * *

"(d) To act as mediator and arbitrator in any controversy or issue that may arise among or between producers and dealers, or any other group in this Act defined, participating in the milk industry.

"(e) To determine and designate any area of the State as a natural marketing area, whenever such determination and designation may be requested, as provided in this Section, to establish definite boundaries between markets in order to secure uniformity, enforce the provisions and effect the purposes of this Act.

"(f) To appoint one or more advisory boards representing all phases of the industry affected, including producers and distributors, to assist the Commission in the performance of its duties. * * *

"(g) To adopt and enforce all rules, regulations and orders necessary to carry out the provisions of this Act, including rules and regulations establishing minimum prices to be paid by milk dealers to producers and others, and to be charged by producers and others to milk dealers for milk in its various grades and uses" and "minimum wholesale or retail prices to be charged by milk dealers for milk handled within the State for fluid consumption wheresoever produced. * * *

"(h) To require the butter fat content of milk and cream received by the distributors from producers to be determined by independent laboratories or qualified persons approved by the Commission."

Section 4 provides penalties for willful failure to comply with the requirements of the act or any lawful rule or order of the commission.

Section 5 is under the caption, "Milk Dealer's License." Every application for such a license must be in writing and must include a designation of the "market or markets in or in connection with which the business of the applicant is proposed to be conducted," and must also state the applicant's "consent to the jurisdiction of the Commission in establishing wholesale and retail prices in the market or markets specified in his application."

Sections 6 and 7 authorize the granting, refusal, or revocation of licenses under prescribed conditions.

Provisions for court review of actions of the commission under section 6 are contained in section 8.

In section 9 certain conditions are specified for consideration by the commission in "determining the reasonableness of prices to be paid or charged * * * for any grade, quantity or class of milk."

Section 10 refers to the form in which licenses shall be issued, section 11 to amending schedules of prices, and section 12 to the nonrenewability of licenses.

Included in section 13 are provisions that all milk "received and/or produced for sale within any marketing area" established under the provisions of the Act "shall be taxed not to exceed one cent for each one hundred pounds," to be paid by the dealer to the commission, but one-half of the amount to be collectible by the dealer from the producer, and that "the books and records of all such dealers shall be open to inspection by the Commission at all times for the purpose of determining the amount of tax due."

Joint agreements of "any two or more distributors purchasing in the same market," "upon prices to be paid by milk dealers to producers and others and to be charged by producers and others to milk dealers" are authorized by section 14, "subject to the regulations laid down in sub-paragraph (g) of Section three," and subject to the commission's approval.

Section 15 provides that all moneys received by the commission shall be paid into the state treasury "to the credit of a special fund therein to be known as the 'Milk Marketing Fund.'" which "shall be subject to withdrawal by the Commission on vouchers drawn upon the State Comptroller," and "shall be used only for the administration and enforcement" of the act, and that the commission may from time to time reduce or increase the tax authorized by section 13 within the rate limit therein specified.

Auditing of the commission's books and accounts is the subject of section 16.

The commission is empowered by section 17 to require licensees to keep records and make reports of facts pertinent and material to the enforcement of the act.

Section 18 applies the provisions of the act to the distribution of milk produced outside of Maryland after "it shall have come to rest within the State."

It is declared by section 19 that no provision of the act "shall apply or be presumed to apply to foreign or interstate commerce, except in so far as the same may be permitted by the Constitution of the United States, the acts of Congress and treaties made thereunder," but the section invests the commission with "power to confer and cooperate with the legally constituted authorities of other states, the District of Columbia and the United States, including the Secretary of Agriculture of the United States, in order to secure a uniform system of milk control."

Section 20 is a declaration that the requirements of the act are in addition to those "now or hereafter exacted from or imposed upon milk producers or dealers, by health authorities, or such other public agencies, by any provisions of law" or "of any charter or ordinance of any municipal corporation," "pertaining to the production, storage, handling, content or marketing of milk."

Raw milk is excepted from the operation of the act by section 21.

In section 22 it is stated that the various sections and

parts of sections of the act are independent, and that if any section or part thereof should be held invalid, the remainder of the act should not be thereby affected unless inseparably connected in meaning and effect with the invalidated provision.

The issuance of provisional licenses pending action by the commission on license applications is permitted by section 23.

Concluding sections of the act declare that "the production, transportation, delivery, processing, storage, distribution and sale of milk in the State is a business affecting the public health and affected with a public interest," and that the act is intended to be "an emergency measure enacted for the purpose of regulating and controlling the milk industry in this State for the protection of the health, welfare and comfort of the inhabitants thereof" (section 2), and that the act shall terminate on June 1st, 1937, unless extended by the General Assembly (section 3).

It will be observed that the Milk Control Law does not directly and immediately delegate to the Milk Control Commission the power to "supervise and regulate the entire milk industry in any marketing area established" under the statute. The existence or the exercise of that power is expressly contingent upon a request being made "by a substantial proportion of the producers and/or consumers, and/or distributors," in any such area. Until a particular marketing area has been defined by the commission, a request from producers, consumers, or distributors within its undetermined limits could not be received, according to the statutory plan. But the power to designate a marketing area is made to depend upon a request which is not legally feasible until the area is established. If this complication be disregarded, there remains the serious difficulty arising from the attempted delegation, under an inexplicit phrase, to an uncertain group, of the right to invoke and make operative the broad powers which the statute describes. The commission itself is not authorized by the act to assume those

powers as the result of the exercise of its own judgment. The initiative is committed to a "substantial proportion" of one or more of the interested classes. If no request is received from such a source, or if requests are not made in an indefinite proportion which may be considered substantial, the commission is powerless to function so far as the regulation or control of the milk industry is concerned. On the other hand, if the provision is valid, the commission might act in deference to the request of a minority, and against the protest of a majority, of the milk producers, consumers, or distributors to be affected. The vitalization of the principal authority under the statute is thus dependent upon such uncertain factors as the expression of a desire by one or more of several groups and a determination by the commission as to what portion of the whole number of interests might properly be considered substantial. Those factors in reality involve a double contingency upon which the exercise of the commission's power of regulation depends.

It is the duty of the court to sustain the validity of legislation by the General Assembly when such a result is possible consistently with constitutional limitations. But the statute under discussion provides for a delegation of authority which we are unable to regard as valid. In the enactment of laws the Legislature acts in the exercise of a power conferred upon it by the people. It cannot validly redelegate that authority. In *Bradshaw v. Lankford*, 73 Md. 428, 430, 21 A. 66, the court said that "to the members of the general assembly, the people have confided the power to pass such laws as they, in the exercise of their judgment, may deem best for the public interests, and they have no power to substitute the judgment of others in matters of legislation for the judgment of those to whom this sovereign trust has been committed." It was said in the opinion in *Levering v. Supervisors*, 137 Md. 281, 288, 112 A. 301, 303, that "the Legislature is a representative body for the purpose of making laws, and it discharges its duty in a representative, delegated capacity, and is without power to delegate either

to a portion or class of the community the exercise of the very power for which it was selected by the people." There is a thorough discussion and a definite application of that principle in the opinion of the court as delivered by Judge Offutt, in the case of *Brawner v. Supervisors,* 141 Md. 586, 119 A. 250. In that opinion it was said to be "universally agreed that the legislature cannot delegate its law making power." While it has been held that local legislation may be enacted subject to its approval by a majority of the voters in the designated locality *(Fell v. State,* 42 Md. 71; *Levering v. Supervisors,* 137 Md. 281, 112 A. 301), support for such enactments has been found, as stated in *Brawner v. Supervisors, supra,* 141 Md. 586, at page 594, 119 A. 250, 252, in "the power which the Legislature, the law making agency of the State, has over its 'derivative creations.' " The delegation with which we are concerned in this instance is not to the voters of a political subdivision or of a described locality, but to an indefinite portion of producer, consumer, and distributor classes in areas having no legislative description. The act itself is not submitted to those classes for their approval, but its salient provisions are not intended to become operative until invoked by their affirmative request. Each of the powers of regulation defined in the act depends upon that initiative. The licensing and taxing powers, while not specified in section 3, in which the contingency in question is prescribed, can only be exercised with respect to marketing areas to be designated under the power which that section purports conditionally to confer. In our opinion the principle which forbids the delegation by the General Assembly of its legislative authority is clearly applicable to the proposal by the Milk Control Act to make the practical use and effectiveness of its regulatory provisions dependent upon such a contingency as it prescribes.

Reference has been made to the declaration, in section 22 of the act, that its various provisions are independent and that an adjudication as to the invalidity of any provision should not affect the remainder of the act except

"to the extent that an entire section or part of section may be inseparably connected in meaning and effect with the section or part of section to which such holding shall directly apply." There is an inseparable connection between every power-conferring provision of the act and that which involves an invalid delegation of legislative authority, and we are therefore unable to regard as exercisable any of the active administrative functions which this suit was brought to restrain.

A fundamental contention in the case was that the Milk Control Law is wholly void as violative of the property and contract rights protected by the Federal and State Constitutions. It is not necessary to discuss and determine that important question for the purposes of the present decision. The statutory powers here complained of are not made effective in the exercise of the General Assembly's own judgment, and are inoperative because of an invalid transfer of that responsibility. There is, consequently, no occasion to express an opinion as to the constitutionality of a direct exercise by the Legislature of a power which it has not in fact thus assumed.

For the reasons we have stated, the decree appealed from was reversed by *per curiam* order, and the cause remanded for a decree to be passed in conformity with this opinion.