**HIGHLAND FARMS DAIRY, Inc., et al. v. AGNEW et al.**

No. 363.

District Court, E. D. Virginia.

Oct. 3, 1936.

Before SOPER, Circuit Judge, and WAY and POLLARD, District Judges.

Hunton, Williams, Anderson, Gay & Moore, of Richmond, Va., and Philip W. Rosenfeld, of Washington, D. C. (E. Randolph Williams, T. Justin Moore, and Stephen H. Simes, all of Richmond, Va., of counsel), for plaintiffs.

Edwin H. Gibson, Asst. Atty. Gen., and John S. Barbour, of Fairfax, Va., for defendants.

SOPER, Circuit Judge.

The plaintiffs in this suit in equity challenged the constitutionality of the Virginia Milk and Cream Act, chapter 357 of the Acts of the General Assembly of Virginia of 1934, and prayed for a temporary and permanent injunction enjoining the members of the State Milk Commission, a body created by the act, from exercising the powers therein conferred upon it. A court of three judges was organized under the provisions of 28 U.S.C.A. § 380 to consider the case.

Material provisions of the statute may be summarized as follows: The preamble declares that the prosperity and health of the people of the state depend to a substan-tial degree upon the production and distribution of milk and cream; that the present economic emergency is in part the result of the disparity between the prices of milk and cream and other commodities which has broken down the orderly production and marketing of milk and cream; that unhealthful, unfair, unjust, destructive, and demoralizing trade practices have grown up and are carried on in the production, sale, and distribution of milk and cream in the state which impair the constant supply of pure wholesome milk to the inhabitants; and that in order to protect the well-being of the people and to promote the public welfare, public health, and public peace, the production, transportation, processing, storage, distribution, and sale of milk and cream in the state should be supervised and controlled in the exercise of the police power of the state as a business affecting the public peace, health, and welfare.

"Distributor" is defined by section 1 to include, amongst others, persons who sell or market milk at wholesale or retail, or who operate stores for the sale of milk at retail for consumption off the premises, and persons, wherever located or operating, whether within or without the state, who purchase, market, or handle milk for resale in the state. "Market" means one or more cities, towns, or villages of the state and the surrounding territory designated by the Commission as a natural marketing area.

Section 2 of the act creates a State Milk Commission. Section 3 confers upon the Commission the power, amongst others, (b) to investigate all matters pertaining to the production, processing, storage, transportation, distribution, and sale of milk in the state; (c) to supervise, regulate, and control such operations in milk for consumption within the state; (g) to make and enforce rules and regulations necessary to carry out the purposes of the act; (m) to define what shall constitute a natural market area and fix the limits of the area within which milk shall be produced to supply any such market area; (i) to exercise its powers in any market after a public hearing has been held for such market, and after the Commission determines that it would be to the public interest that it shall exercise its powers in such market. The hearing may be had upon its own motion or upon the application of producers supplying a substantial proportion of the

milk consumed in the market or of distributors distributing a substantial proportion of the milk consumed in such market. The Commission may withdraw the exercise of its powers from any market after a public hearing has been held and the Commission determines that it will be to the public interest to do so. The Commission shall withdraw the exercise of its powers from any market upon written application of a majority of the producers (measured by volume) of milk produced and a majority of the distributors (measured by volume) of milk distributed in said market acting jointly. (j) The Commission may, after public hearing and investigation, fix the prices to be paid producers by distributors in any market and may fix the minimum and maximum wholesale and retail prices to be charged for milk in any market. In determining the reasonableness of the prices to be charged, the Commission is to be guided by the cost of production and distribution, including compliance with sanitary regulations, operation and delivery charges, and the welfare of the public. The Commission may require all distributors in any market to be licensed by the Commission for the purpose of carrying out the provisions of the act. It may decline to grant any license and suspend or revoke a license upon due notice, and after hearing under section 6 any order of the Commission in refusing to issue a license or suspending or revoking a license may be reviewed on appeal to the Supreme Court of Appeals.

Under section 4, no distributor in any market in which the act is in effect shall buy milk from producers or others for sale within the state, or sell or distribute milk within the state unless such distributor is duly licensed under the act. It is unlawful for a distributor to buy milk from or sell milk to a distributor who is not licensed under the act.

Section 8 provides substantial penalties to be imposed upon any person found guilty of failing or refusing to comply with any subpœna issued by the Commission. Section 9 provides that the Milk Commission shall prepare an annual budget and collect the sums required therefor from the local milk boards in the form of monthly assessments, which will not exceed 2 cents per hundred pounds of milk handled in each market. The local milk boards, provided under section 11, consisting of five members, are to be established by the producers and distributors in a market area

to carry out the provisions of the act in conjunction with the State Milk Commission. The expenses of the Milk Board, including the assessment levied by the State Milk Commission, shall be met by an assessment of not over 2 cents per hundred pounds of milk handled by distributors, and not over 2 cents per hundred pounds sold by producers. Section 13 provides that any person violating any provision of the act or of any license issued by the Commission shall be guilty of a misdemeanor and punished by fine of $25 to $100, or imprisonment in jail for not less than thirty days or more than one year, or by both fine and imprisonment. Section 14 provides that no provision of the act shall apply or be construed to apply to foreign or interstate commerce unless the same may be effective pursuant to the Federal Constitution. Section 16 provides that if any part of the act shall be declared unconstitutional for any reason, the remainder of the act shall not be affected thereby. Section 17 provides that the period of public emergency during which the act shall be effective shall be until such date as the Legislature may designate to be the termination thereof, or if the Legislature be not in session, the date so designated by a proclamation of the Governor.

The parties have agreed upon a stipulation of facts from which it appears that the Highland Farms Dairy, Inc., is a Virginia corporation which has its principal place of business in the District of Columbia, where it operates a creamery for the pasteurizing and processing of milk, all of which it sells under contract to the individual plaintiff, Luther W. High, a resident of the District of Columbia. High operates a group of retail stores for the sale of dairy products in Virginia, Maryland, and the District of Columbia, and purchases all of the milk sold by him in Virginia from the Highland Farms Dairy. The latter purchases its milk under contract from farmers and producers in Virginia, Maryland, and the District of Columbia, for delivery to the creameries in Washington. About 20 per cent. of this milk is purchased from Virginia producers, substantially all of which is produced in an area which has been designated by the Milk Commission as the Arlington-Alexandria Production Area. All of this milk, when received at the dairy, is commingled with milk purchased elsewhere, and it is impossible to determine what portion of the milk eventually sold by High in the territory

designated by the Milk Commission as the Arlington-Alexandria Sales Area was originally produced in the said production area.

High makes no delivery of milk, but sells it all for cash at retail in bottles to purchasers at his stores. It is therefore essential to his business that there be a differential between the price charged by him and the prices of other distributors who permit charge accounts and make deliveries. The bottled milk distributed by High in Virginia is sold to him in the District of Columbia but is delivered to his Virginia stores by the dairy trucks upon orders received by telephone.

On March 27, 1936, the State Milk Commission established the Arlington-Alexandria Milk Market, and fixed the prices at which milk should be sold therein. This was done after a public hearing at Richmond, Va., on February 20, 1936, which was called by the Commission at the request of the Virginia and Maryland Milk Producers' Association to consider the establishment of such a market. Notice of the meeting was advertised in two newspapers in the area affected from February 6, to February 17, 1936, two notices appearing in one paper and three in another. Consequently producers, consumers, and distributors in the area generally had knowledge that the hearing was to be had. Neither of the plaintiffs, however, was present at the meeting or represented thereat. The Commission gave notice at the hearing that it would consult with any group with regard to the establishment and the regulations to be issued, and this offer was accepted by various individuals between the date of the hearing and the establishment of the area. In establishing the market and the governing rules and regulations, the Commission considered not only the statements and testimony that were made at the public hearing, but also certain treatises upon the production and distribution of milk. The sales and production areas and the governing rules and regulations were finally made effective on June 1, 1936. Plaintiffs had knowledge of the establishment of the area and of the adoption of the rules and regulations, but continuously sold milk at prices lower than the minimums prescribed for wholesalers and retailers respectively in the regulations adopted. For example, the prices per quart fixed by the Commission for the sale of cultured whole milk at wholesale and retail and the prices actually charged therefor by the dairy to High at wholesale, and by

High to consumers at retail, were as follows:

|  | Wholesale | Retail |
|---|---|---|
| Commission's price | 11¢ | 13¢ |
| Dairy's price in Washington | 6¢ | |
| High's price in Virginia | | 8¢ |

A bill similar in purpose to the act finally passed by the Virginia Legislature was introduced in the House of Delegates on February 19, 1934, but was rejected by a vote of that body on March 5, 1934. The bill, which eventually became the Milk and Cream Act, was introduced on March 10, 1934, the last day of the session, accompanied by a letter from the Governor of the state urging its passage. It passed both houses of the Legislature on that day, printings and constitutional readings being waived.

The original bill of complaint was filed herein on May 29, 1936, and prayed for a temporary restraining order enjoining the Milk Commission from exercising its powers in the Arlington-Alexandria Milk Market during the pendency of the action and until the application for interlocutory injunction could be heard. The District Judge, however, refused a restraining order upon the ground that there was no showing of a present danger of irreparable damage, without prejudice to the right of the plaintiff to make subsequent applications. High made no application for a license under the act, and on June 6, 1936, the Commission threatened to invoke against him the remedy of injunction specified in section 12 of the act wherein it is provided that if any person fails to comply with any rule or order of the Commission, the Hustings Court of the city of Richmond, upon application of the Commission, shall compel obedience by attachment proceedings for contempt. The amended bill of complaint was thereafter filed in which application for a temporary restraining order and an interlocutory and permanent injunction was renewed; and an answer having been filed, the case came before the court upon these applications.

The plaintiffs' contentions with reference to the constitutionality of the act may be summarized as follows:

(I) The act cannot be upheld as an emergency price fixing measure in the exercise of the police power of the state because (a) there was a total absence of any legislative investigation into the facts; and (b) the Legislature did not determine that

an emergency existed, but (1) delegated the power to the Commission to determine whether or not the emergency existed, and if so, in what parts of the state; and (2) authorized the producers and distributors controlling a majority in volume of the milk in any market to put an end to the operation of the act therein; and (3) failed to fix a definite time limit to the operation of the act.

(II) The act is invalid because it contains a delegation of legislative power to the Milk Commission contrary to the State Constitution to establish markets and exercise its powers of control over the sale of milk therein and to withdraw the exercise of its powers from such market, to fix prices of the sale of milk, and to issue and revoke licenses to persons to engage in the milk business without reference to any prescribed standard.

(III) The exercise of the powers conferred upon the Commission, as above set out, necessarily involved a denial of the equal protection of the laws and a denial of due process in contravention of the Fourteenth Amendment to the Federal Constitution.

(IV) The action of the Milk Commission in (1) establishing a market, (2) in fixing minimum prices, and (3) in adopting rules and regulations, constituted a denial of due process because of procedural errors on the part of the Commission in that (1) the action was based in part on data not introduced in evidence at the public hearing, and (2) no evidence as to the cost of the production of milk was taken at that hearing.

(V) The act and the regulations passed by the Milk Commission are invalid because they constitute an interference on the part of the state with interstate commerce in that (1) they required the Highland Farms Dairy, a corporation of the District of Columbia, doing no business in Virginia, to secure a license in order to engage in interstate commerce; (2) and fixed the prices to be paid by High to the Highland Farms Dairy for milk sold to him by the corporation in the District of Columbia; and (3) authorized the Commission to levy an assessment on milk shipped in interstate commerce.

The authority of a state Legislature in the exercise of the police power to regulate the price of milk through the agency of an administrative board is established by the decision of the Supreme Court in Neb-

bia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469. An act of the state Legislature was upheld which established a milk control board with power, among other things, to fix the retail prices to be charged for milk for consumption off the premises where sold. The court held that the rights of property and of contract are not absolute, and that the Fifth Amendment, in the field of federal activity, and the Fourteenth as respects state action, do not prohibit governmental regulation of private business for the public welfare, but require only that the laws shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object to be attained; that the private character of a business does not exempt it from price regulation in the common interest, and that the New York Legislature, having found that the low price of milk in the state had led to a demoralization of the market and affected the health and prosperity of the people, the Legislature acted within the scope of its power in prescribing the regulation described. For later decisions of the Supreme Court see Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281, and Borden's Co. v. Ten Eyck, 297 U.S. 251, 56 S.Ct. 453, 80 L.Ed. 669.

Of equal importance in the determination of the pending case is the decision of the Supreme Court of Appeals of Virginia in Reynolds v. Milk Commission of Virginia, 163 Va. 957, 179 S.E. 507, in which the constitutionality of the Virginia Milk Control Act was upheld by a divided court. It was held that there are no substantial differences between the Virginia Act and the New York Act, and that the Virginia Act does not contravene the Fourteenth Amendment of the Federal Constitution, or the similar provision found in section 1, article 1 of the Virginia Constitution, but, on the contrary, is a proper exercise of the police power of the state in the public interest in view of the uncontroverted finding by the Virginia Legislature of an imperative need to regulate the milk industry in the state even to the extent of fixing prices so as to protect the industry from serious impairment or destruction.

The court declared that the state Legislature was better qualified than the court to determine the necessity and degree of regulation of an industry, and that its conclusions should not be disturbed unless they are clearly arbitrary and unreasonable. It

was pointed out that arbitrary regulations issued by the Board might be invalid without affecting the constitutionality of the act, and that if the Commission should promulgate such regulations, the courts would declare them to be void.

The court considered the argument that the power given to the Commission to make and enforce rules and regulations was a delegation of legislative power to enact prohibitory legislation operative only in certain areas defined by the Commission and showed that a similar provision had been upheld in the Nebbia Case.

Similarly, state milk control acts have been held valid as within the police power of the state in the following decisions of state courts: People v. Nebbia, 262 N.Y. 259, 186 N.E. 694; State Board of Milk Control v. Newark Milk Co., 118 N.J.Eq. 504, 179 A. 116; State ex rel. Finnegan v. Lincoln Dairy (Wis.) 265 N.W. 197; Albert v. Milk Control Board (Ind.Sup.) 200 N.E. 688; Rohrer v. Milk Control Board, 322 Pa. 257, 186 A. 336; Franklin v. State, 232 Ala. 637, 169 So. 295; Miami Home Milk Producers Ass'n v. Milk Control Board (Fla.) 169 So. 541. In three states, the Supreme Court, without questioning the extension of the police power to cover price fixing regulations by state boards under milk control acts, have declared the local statutes invalid because of an improper delegation of legislative power. See Griffiths v. Robinson, 181 Wash. 438, 43 P.(2d) 977; Md. Co-operative Milk Producers v. Miller (Md.) 182 A. 432; Van Winkle v. Fred Meyer, Inc., 151 Or. 455, 49 P.(2d) 1140.

Notwithstanding these decisions, the plaintiffs contend that the Virginia act is unconstitutional as a violation of the due process clause of the Fourteenth Amendment for reasons not considered in Reynolds v. Milk Commission. It is conceded that the Legislature may have had power to pass a milk control price fixing act, if the Legislature had found that the circumstances of emergency described in the preamble of the act actually existed; but it is asserted that the Legislature failed to make such a determination and left the matter to the uncontrolled discretion of the Milk Control Board. It is said that there was no investigation by legislative committee, such as preceded the passage of the New York act, but the Virginia act was hastily passed on the last day of the legislative session; that under section 3 (i) the act

does not become effective in any marketing area until the Commission, after public hearing, determines that it will be to the public interest to exercise its powers therein, and that the Commission is authorized to withdraw from any market after a similar hearing and determination; that the failure of the Legislature to exercise its own authority is further shown by the provision of section 3 (i) which gives to a majority of the producers of milk produced and to a majority of the distributors in any market acting jointly the right to cause the Commission to withdraw from that market; and that finally, there was a lack of definite action on the part of the Legislature because it made no provision for the termination of the act other than section 17 which provides that the period of public emergency, during which the act shall be effective, shall be until the Legislature designates the termination, or if it be not in session, the date designated by the proclamation of the Governor.

This construction of the act cannot in our opinion be upheld. We may not disregard the positive declarations of the preamble merely because there was no formal investigation by a legislative committee and the statute was passed on the last day of the session. Indeed the rejection of the measure proposed earlier in the session indicates that the subject had been considered with some deliberation. Nor is the interpretation contended for in accord with the decision of the Virginia court in Reynolds v. Milk Commission, which points to the legislative determination of fact in the preamble as indicating an imperative need of state control of the production and distribution of milk. Not only is this interpretation binding upon us as the construction of a state act by the highest court of the state, but it is in harmony with our understanding of the legislative intent. We do not think that the authority given to the Board to determine in what areas it should exercise its powers contradicts or nullifies the legislative finding, or amounts to an improper delegation of legislative power. It is merely left to the Board to ascertain whether trade practices, harmful to the public interest, are prevalent in a particular area, and if so, to exercise the power to make rules and regulations and fix prices for the milk produced and distributed therein. The New York Act (Laws 1933, c. 158) differed in that it was made effective generally, but broad discre-

tion was conferred upon the State Milk Control Board under section 312 of the act to investigate the reasonable costs and charges for producing milk and to fix the minimum prices to be paid to purchasers of milk in its various grades. Provisions quite similar to the Virginia act are found in the statutes passed in 1935 in Alabama, pp. 204, 207, § 5; in Wisconsin, Laws 1935, c. 58, § 3 (1) (c), (3) (a) and (b); and in Indiana, Acts 1935, c. 281, § 15.

■ There is no impropriety in the legislative delegation of authority to the executive to act or withhold action in carrying out the legislative intent in conformity with principles laid down in the governing law. Thus Congress may empower the President, when in his opinion the public safety shall require, to lay an embargo on ships in the ports of the United States. Field & Co. v. Clark, 143 U.S. 649, 683, 12 S.Ct. 495, 36 L.Ed. 294; or to discontinue the suspension of commercial intercourse with foreign countries, required by an act of Congress; or to suspend by proclamation the free introduction into this country of enumerated articles when satisfied that unreasonable exactions are imposed upon the products of the United States by the country producing them, or to increase or decrease tariff duties so as to equalize the differences between costs of production at home and abroad. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624. See, also, United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 and Fallbrook Irr. Dist. v. Bradley, 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369.

■■ Hence we reject the suggestion that the Arlington-Alexandria Milk Market was illegally established by the Milk Commission in the exercise of an arbitrary power and discretion conferred upon them by the Legislature without any legislative standard of action to guide them. We also conclude that this action of the Commission is not invalidated because the Legislature in section 3 (i) directed the Commission to withdraw the exercise of its power from any market upon the written application of a majority of the producers and a majority of the distributors of milk, measured by volume, in said market acting jointly; or because the Governor of the state was empowered by section 17 of the act, if the Legislature be not in session, to designate by proclamation the termination of the period of public emergency during which the act shall be effective. No attempt has been made in this case to exercise the powers so described, and we have no occasion to decide whether they may ever be lawfully exercised by the persons named. But even if these provisions are invalid because they contain no guide as to the conditions under which the powers conferred may be exercised, it does not follow that the Legislature has not actually found that the emergency exists. The incorporation of invalid sections does not destroy the whole act, because it is provided in section 16 thereof that if any section, clause, sentence, or paragraph thereof be declared unconstitutional for any reason, the remainder of the act shall not be affected thereby.

■ Having declared the emergency and the necessity for regulation of the business, the Legislature was not without power to delegate to the Board the authority to limit the market areas, to fix the prices to be charged therein, and to issue and revoke licenses to persons engaged in the milk business. These questions did not pass unnoticed by the Virginia court in Reynolds v. Milk Commission, either in the majority or minority opinions, where references were made to the power of the Board to make rules and regulations necessary to carry out the purposes of the act and to grant and refuse licenses, subject to the review of that court. It is clear that the court would not have sustained the act had the majority of the judges thought that an unconstitutional delegation of power had been granted. The New York act of 1933 (chapter 158) considered in the Nebbia Case, provided in section 312 (b) that the Board should fix prices, which might vary in different markets, and designate the markets to which the prices should be applicable. Prices fixed by the Board did vary as to classes of dealers and localities. See Nebbia v. New York, 291 U.S. 502, 520, 540, 54 S.Ct. 505, 508, 517, 78 L.Ed. 940, 89 A.L.R. 1469, and it does not appear that the act was deemed to be invalid on this account either in the Supreme Court of the United States or the Court of Appeals of New York. See People v. Nebbia, 262 N.Y. 259, 186 N.E. 694. The question as to price was definitely decided adversely to the defendants' contention under the New Jersey Act in State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504, 179 A. 116, 124, where it was held that the Legislature having declared the general policy and set the standard to be followed, properly left it to the adminis-

trative agency to take proper steps to eliminate destructive trade practices and to fix prices with reference to the grade of milk, costs of production, marketing, and transportation so as to permit a reasonable return to the producer and the milk dealers. A similar standard was set up in section 3 (j) of the Virginia act. See, also, State ex rel. Finnegan v. Lincoln Dairy Co. (Wis.) 265 N.W. 197; Albert v. Milk Control Board of Ind. (Ind.Sup.) 200 N.E. 688, 694; Rohrer v. Milk Control Board of Pa., 322 Pa. 257, 186 A. 336, 337; Franklin v. State, 232 Ala. 637, 169 So. 295; Miami Home Milk Producers Ass'n v. Milk Control Board (Fla.) 169 So. 541. Compare, Griffiths v. Robinson, 181 Wash. 438, 43 P. (2d) 977; Maryland Co-operative Milk Producers v. Miller (Md.) 182 A. 432; Van Winkle v. Meyer, Inc., 151 Or. 455, 49 P. (2d) 1140.

In the pending case, the Milk Commission held a public hearing to consider the propriety of exercising its powers in the area affected, and subsequently outlined the Arlington-Alexandria Sales Area and the Arlington-Alexandria Production Area, and passed rules and regulations which undertook to control the production and distribution of milk and fixed the prices to be paid for the product. There is no distinction between the action thus taken in conformity with the standards laid down by the Legislature and conduct which was approved in the cited cases.

The plaintiffs emphasize the license provisions of the act, contending that here, in any event, are provisions so devoid of legislative standard as to leave to the Commission the unrestricted power to grant or refuse a license to a dealer in milk in its arbitrary discretion; and it is contended that these provisions not only involve an unlawful delegation of power, but in their effect amount to a denial of due process of law guaranteed by the Fourteenth Amendment. The license provisions are as follows:

"Section 3. * * * (k) The commission may require all distributors in any market designated by the commission to be licensed by the commission for the purpose of carrying out the provisions of this act. The commission may decline to grant a license, or may suspend or revoke a license already granted upon due notice and after a hearing. The commission may classify licenses, and may issue licenses to distributors to process or store or sell milk to a particular city or village or to a particular market or markets within the Commonwealth."

"Section 5. An application to the commission for a license to operate as a distributor shall be made by mail or otherwise within five days after the provisions of this act become effective in a market, and as to any distributor thereafter beginning business, before such distributor shall begin such business therein. The application shall be made on blanks furnished by the commission for the purpose."

"Section 6. Any order of the commission in refusing to issue a license, or suspending or revoking a license, may be reviewed on appeal to the Supreme Court of Appeals."

"Section 8. * * * In the event any person shall fail to comply with any rule, regulation or order of the commission, * * * it shall be the duty of the Hustings court of the city of Richmond, * * * upon application of the commission, to compel obedience by attachment proceedings for contempt."

"Section 12. In the event of violation of any provision of this act, in addition to any other remedy, the commission may apply to any court of record in the city of Richmond for relief by injunction, if necessary, to protect the public interest, without being compelled to allege or prove that any adequate remedy at law does not exist."

"Section 13. Penalties.—Any person violating any provision of this act or of any license issued by the commission shall be guilty of a misdemeanor and may be prosecuted and punished therefor, and, upon conviction, shall be punished by a fine of not less than twenty-five dollars nor more than one hundred dollars, or by imprisonment in the county jail for not less than thirty days nor more than one year, or by both fine and imprisonment, and each day during which such violation shall continue shall be deemed a separate violation." [1]

---

[1] No other Milk Control Act, to which our attention has been called, contains conditions of like breadth. The New York Act of 1933, for example, contains in section 308 (3) specific terms listing the acts or omissions which justify the rejection or suspension of a license, such as unreasonable rejection by a distributor of milk purchased from a producer or failure to pay for milk purchased, or violating any provision of the act.

The stipulation shows that the Milk Commission has threatened to invoke against High the remedy by injunction provided in section 12 of the act, so as to restrain him from continuing his business as a milk dealer without first having obtained the required license, and also from violating the regulations of the ·Commission as to retail sale prices. It does not appear that High has ever made application for a license or intends so to do; and the only reasonable inference to be drawn from the institution and prosecution of this case is that the plaintiffs, regarding the act as unconstitutional, propose to continue their trade practices irrespective of its provisions.

On the other hand, no conditions or restrictions upon the grant of licenses have been imposed in the regulations of the Board, and there is no indication that a license would be withheld from any one willing to abide by the terms of the statute. In Reynolds v. Milk Commission, 163 Va. 957, 179 S.E. 507, 514, it was said that the license provision was not challenged. It might be proper also in the pending case to disregard it in the absence of arbitrary and unreasonable conduct on the part of the Commission, and of any evidence that such conduct is contemplated. Nevertheless, it is not inappropriate to point out that the license provisions of the act should not be interpreted to vest the Board with the absolute power to grant or refuse licenses, if any other reasonable construction can be adopted. Such a grant of power would be invalid, and the attempt to exercise it arbitrarily would be restrained by a court of equity as a violation of the due process clause of the Fourteenth Amendment. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; People of State of New York ex rel. Lieberman v. Van De Carr, 199 U.S. 552, 26 S.Ct. 144, 50 L.Ed. 305; Douglas v. Noble, 261 U.S. 165, 43 S. Ct. 303, 67 L.Ed. 590; Lehman v. State Board of Public Accountancy, 263 U.S. 394, 44 S.Ct. 128, 68 L.Ed. 354.

In our opinion, the act is susceptible of a more reasonable interpretation. It was not the intent of the Legislature to confer upon the administrative board the extraordinary power to determine at will who should and who should not engage in the distribution of milk, but rather to render available to the Milk Commission and the local boards a list of authorized distributors of milk and to enable the authorities more readily to supervise the business of distribution and to enforce the rules, regulations, and orders promulgated by the Board. In the absence of provision to the contrary, it would appear to be the duty of the Board to issue a license to any distributor complying with the statute and to preserve his license until some violation of the act or of a regulation or order had taken place. Such a standard would be sufficient to sustain the act, although less specific in detail than other similar statutes. In People of State of New York ex rel. Lieberman v. Van De Carr, 199 U.S. 552, 26 S.Ct. 144, 146, 50 L. Ed. 305, the Supreme Court considered a section of the Sanitary Code of New York City, which provided that no milk should be received for sale and delivered in the city of New York without a permit in writing from the Board of Health. It was objected that the statute devolved upon the Board of Health absolute and despotic power to grant or withhold permits to milk dealers and was therefore not due process of law. The Supreme Court, commenting on the decisions of the New York courts which indicated the power to issue or withhold permits must be used in the exercise of a reasonable discretion and that arbitrary action and unjust discrimination would not be tolerated, said "That this court will not interfere because the states have seen fit to give administrative discretion to local boards to grant or withhold licenses or permits to carry on trades or occupations, or perform acts which are properly the subject of regulation in the exercise of the reserved power of the states to protect the health and safety of its people, there can be no doubt." After citing certain cases, the court continued: "These cases leave in no doubt the proposition that the conferring of discretionary power upon administrative boards to grant or withhold permission to carry on· a trade or business which is the proper subject of regulation within the police power of the state is not violative of rights secured by the 14th Amendment. There is no presumption that the power will be arbitrarily exercised, and when it is shown to be thus exercised against the individual, under sanction of state authority, this court has not hesitated to interfere for his protection, when the case has come before it in such manner as to authorize the interference of a Federal court."

In Smith v. Cahoon, 283 U.S. 553, 562, 51 S.Ct. 582, 585, 75 L.Ed. 1264, it was said: "The principle is well established

that, when a statute, valid upon its face, requires the issue of a license or certificate as a condition precedent to carrying on a business or following a vocation, one who is within the terms of the statute, but has failed to make the required application, is not at liberty to complain because of his anticipation of improper or invalid action in administration." See, also, Lehman v. State Board of Public Accountancy, 263 U. S. 394, 44 S.Ct. 128, 68 L.Ed. 354; Continental Baking Co. v. Woodring, 286 U.S. 352, 366, 367, 52 S.Ct. 595, 599, 76 L.Ed. 1155, 81 A.L.R. 1402; The Problem of Apparently Unguided Administrative Discretion by Lewis Allen Sigler, 19 St. Louis L.R. 261, 291, et seq.

The cases we have cited also dispose of the contention that the enforcement of the act necessarily entails a denial to the plaintiffs of the equal protection of the laws and the due process of law in violation of the Fourteenth Amendment. Thus in Nebbia v. New York, supra, it was held that a storekeeper was not denied the equal protection of the laws by an order which required him, if he purchased his supply from a dealer, to buy and sell the product at a minimum price, whereas the dealer might buy his supplies from the farmer and sell them at lower prices, and that such an order was not on its face arbitrary or unreasonable, as there are obvious distinctions between the two sorts of merchants which might well justify a different treatment. Likewise, it was decided that there was no denial of due process in the general scheme of the act because the state is free to adopt whatever economic policy may reasonably be deemed to promote the public welfare, and if laws passed to that end have a reasonable relation to the legislative purpose and are neither arbitrary nor discriminatory, the requirements of due process are satisfied. (See 291 U.S. 502, at pages 530–537, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469).

Nor does the failure of the Legislature of Virginia to provide for an appeal to the courts from the decisions or orders of the Board in relation to such matters as the determination of market areas and the fixing of prices amount to a denial of due process. It is true that if a Legislature attempts to make the findings of fact of its agencies conclusive, even though the findings are wrong and constitutional rights have been invaded, the legislative action is invalid, for the judicial power of the courts cannot thus be circumscribed. St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033; Ohio Valley Water Co. v. Ben Avon, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908; Chicago, M. & St. P. R. Co. v. Minnesota, 134 U.S. 418, 10 S.Ct. 462, 702, 33 L.Ed. 970. But the statute under consideration does not attempt to circumscribe the powers of a court, and it is not invalid simply because it does not specifically provide for access to the courts. Such access always exists if there is any arbitrary action on the part of the Legislature or of a legislative agency which deprives a citizen of his constitutional rights. See Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 29 S.Ct. 67, 53 L. Ed. 150; Louisville & Nashville R. R. Co. v. Garrett, 231 U.S. 298, 310, 34 S.Ct. 48, 58 L.Ed. 229; Coal & Coke Ry. Co. v. Conley, 67 W.Va. 129, 67 S.E. 613; Weimer v. Bunbury, 30 Mich. 201.

It seems also to be suggested that the whole act violates the Fourteenth Amendment because of the penal provisions of sections 8 and 13. Section 8 imposes a penalty not exceeding $100 or imprisonment not exceeding 90 days upon any person failing or refusing to comply with any subpœna issued by the Commission and each day during which the violation continues is deemed a separate offense. Section 13 imposes a penalty by fine of not less than $25 or more than $100 or imprisonment in jail for not less than thirty days nor more than one year, or both fine and imprisonment, upon any person violating any provision of the act or of any license issued by the Commission, and each day during which the violation continues is deemed a separate violation. No attempt has been made in this case to enforce a penalty under either section. Even if it be supposed that these penalties are so excessive in their cumulative effect that defense in a criminal case would not afford a reasonable opportunity to test the propriety of the action of the Commission, it does not follow that the whole act is invalid. The procedure to be followed with regard to such penalties, when the enforcement of the orders of a legislative agency or administrative body is resisted on constitutional grounds, is suggested by the decision in Oklahoma Operating Co. v. Love, 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596. Under the statute considered in that case, the order of the State Corporation Commission was not reviewable in any court

of the state, and the only opportunity for a judicial test was to disobey the order and to apply to the Supreme Court, meanwhile running the risk of the imposition of accumulating penalties, not exceeding $500 a day. It was held that the provision for the enforcement of the act by penalties was violative of the Fourteenth Amendment, and that the plaintiff was entitled to a temporary injunction in the federal court restraining the enforcement of the penalty pending the final hearing upon the constitutionality of the order. If, upon final hearing, the order should be found to be invalid, permanent injunction against the enforcement of the order should be issued, and likewise, if the order should be found to be lawful, permanent injunction should nevertheless be issued to restrain enforcement of penalties pendente lite, provided that it be found that the plaintiff had reasonable ground to contest the order. Compare Missouri Pac. R. Co. v. Nebraska, 217 U.S. 196, 30 S.Ct. 461, 54 L.Ed. 727, 18 Ann.Cas. 989; Wadley Southern R. Co. v. Georgia, 235 U.S. 651, 35 S.Ct. 214, 59 L. Ed. 405.

The plaintiffs also complain that the action of the Milk Board in establishing the market area and fixing the minimum prices for production and distribution of milk was not had in accordance with the provisions of the statute, and was taken in violation of due process of law. The point relates to the nature of the public hearing which the Commission conducted. Section 3 (i) provides that the Commission shall not exercise its power in a market until a public hearing has been held for such market and the Commission determines that it will be to the public interest to exercise its powers therein; and section 3 (j) provides that the Commission, after public hearing and investigation, may fix the prices to be paid producers by distributors and to be charged in the wholesale and retail distribution of milk, taking into consideration in determining the reasonableness of the prices, the cost of production and distribution, and the welfare of the general public.

A public meeting was held in Richmond, Va., on February 20, 1936, at which were present a score of dairymen and milk producers and some discussion as to the establishment of the market area and the prices of milk took place. It is stipulated that thereafter the Commission established the area and the rules and regulations not only upon the basis of the information obtained by it at this public hearing, but also upon the basis of information subsequently furnished it by interested persons during the month of March, the Commission having announced at the hearing that it would receive additional communications. The Commission also took into consideration certain treatises which the Commission had in its files or received subsequent to the hearing bearing upon the general subject of the marketing of milk. It is contended that not only was the evidence presented at the hearing entirely inadequate to enable the Commission to carry out the duties imposed upon it by the act, but that the Commission violated the rules of proper procedure when it took into consideration material not offered at the hearing.

The plaintiffs particularly rely on the decision in Morgan v. United States, 56 S. Ct. 906, 80 L.Ed. 1288, which dealt with the duty imposed upon the Secretary of Agriculture to grant a full hearing and receive evidence before fixing rates for stockyard services under the Packers' and Stock Yards' Act of 1921 (7 U.S.C.A. § 181 et seq.). It was held that while the order of the Secretary was legislative, the proceeding had special attributes, and that the Secretary was required to make his determination in accordance with the procedural requirements contemplated by the statute, including a full hearing and the reception of evidence adequate to support the necessary findings of fact. Attention was called to the provision of the Packers' and Stock Yards' Act which makes applicable to the jurisdiction, powers, and duties of the Secretary, all laws relating to the suspension or restraint of the enforcement of orders of the Interstate Commerce Commission. The cases cited by the Supreme Court show that it is well established that a proceeding of this character before the Interstate Commerce Commission has a quasi judicial character and that the usual incidents of due process applicable to an adversary proceeding must be followed.

But it is our view, expressed in the absence of a controlling interpretation by the state court, that these cases have no application to the sort of hearing contemplated by the Virginia Milk Control Act. The proceeding before the Milk Commission was not quasi judicial, but legislative. It is true that the act made provision for a public hearing without which the Commission was not authorized either to exercise its powers in any market area or to fix

prices; but this hearing was to be of the same nature as that held by a legislative committee in considering proposed legislation. The act contains no directions as to the kind of notice to be given, and evidently merely contemplated notice by advertisement to the general public. No other notice was feasible, considering the large number of persons engaged in production and distribution of milk. The Commission was undoubtedly justified in the exercise of its legislative function in taking into consideration not only the facts presented at the public hearing, but those which came to it subsequently from interested parties or were disclosed by its own investigation into the facts and the literature bearing upon the subject. See State Board of Milk Control v. Newark Milk Co., 118 N.J.Eq. 504, 179 A. 116, 125, 126; Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 296, 308, 53 S.Ct. 350, 355, 77 L. Ed. 796.

■ Even if the Commission's hearing was quasi judicial, the plaintiffs have small ground to complain. Although wide publicity was given prior to the hearing, the plaintiffs failed to attend and offer evidence; nor have they since applied to the Board for a modification of this action on the ground that it was arbitrary or ill-advised. The courts have quite generally taken the position that one who complains of the unreasonable character of rules and regulations adopted by an administrative board must seek relief from the Board before applying to the courts. See Red C Oil Mfg. Co. v. Board of Agriculture, 222 U.S. 380, 394, 32 S.Ct. 152, 56 L.Ed. 240; Hegeman Farms Corp. v. Baldwin, 293 U.S. 163, 172, 55 S.Ct. 7, 10, 79 L.Ed. 259; P. F. Petersen Baking Co. v. Bryan, 290 U.S. 570, 575, 54 S.Ct. 277, 78 L.Ed. 505, 90 A. L.R. 1285; Reynolds v. Milk Commission, 163 Va. 957, 179 S.E. 507, 515; Rohrer v. Milk Control Board, 322 Pa. 257, 186 A. 336.

■ Finally, the complainants say that the act and the regulations in pursuance thereof are invalid because they impose a burden on interstate commerce in violation of sections 8 and 10 of article 1 of the Federal Constitution. The argument rests, so far as section 8 is concerned, upon the interpretation of certain provisions of the act to mean that a distributor of milk in an area established by the Commission is forbidden to buy from a distributor located beyond the borders of the state unless the latter shall have first obtained a license from the Commission; and also that the distributor beyond the state, unless licensed, is forbidden to make such a sale; and that if the foreign distributor is licensed, he shall conform to the prices fixed by the Commission and shall comply with its rules and regulations and orders, subject to incurring the penalties prescribed by the act. This interpretation is based upon the definition of "distributor" in section 1 of the act to include persons, wherever located or operating, whether within or without the commonwealth of Virginia, and upon the provisions of section 4 that no distributor in a market in which the provisions of the act are in effect shall buy milk from producers or others for sale within the state, or sell milk within the state unless the distributor is duly licensed under the provisions of the act, and providing further, that it shall be unlawful for a distributor to buy milk from or sell milk to a distributor who is not licensed as required by the act.

If the act is given this meaning, it is doubtless invalid as a direct and unconstitutional burden on interstate commerce. In Baldwin v. G. A. F. Seelig, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032, 101 A.L.R. 55, the Supreme Court held that a law or regulation of the state of New York was invalid, as a violation of article 1, § 8, cl. 3 of the Constitution, which prohibited the sale of milk imported from another state unless the price paid therein to the producer was equal to the minimum prescribed by New York for purchases from local producers. We think that the act does not have the meaning attributed it, although the language of the sections under discussion give some support to the complainants' argument; for when the act is considered as a whole, including the admonition of section 14 that no provision of the act shall be construed to apply to foreign or interstate commerce except in so far as the same may be effective pursuant to the United States Constitution, it is seen that the act was not designed to apply to a distributor beyond the state either as to prices or licenses.

Section 3 (j) of the act gives the Commission power to establish markets and to fix prices to be paid to producers by distributors, and wholesale and retail prices to be charged by distributors therein. The term "market" means any city or town of the commonwealth or two or more cities and towns and surrounding territory designated by the Commission as a natural mar-

keting area. Obviously the area designated is to be confined by the Commission to territory within the state of Virginia, and consequently the power of the Commission to fix prices in any market is to be enforced only within the state.

Likewise, section 3 (k) provides that the Commission may require all distributors in any market designated by the Commission to be licensed by the Commission, so that here also the powers of the Commission are restricted to Virginia territory.

Sections 1 (2) and 4 are broader in their literal significance; but when it is borne in mind that the dairy in the instant case is not required by the act to be licensed, or to sell at prices fixed by the Commission, since it is located in Washington and is not a distributor in any market designated by the Commission, it is seen that the act does not forbid High from purchasing milk from the dairy in the District of Columbia, or fix the price which he shall there pay. Furthermore, even if the plaintiffs correctly construe these provisions of the act, the whole does not fall because section 16 provides that if any section, clause, sentence, or paragraph be declared unconstitutional, the remainder of the act shall not be affected thereby.

The violation of section 10 of article 1 of the Constitution complained of is that the act imposes a tax or assessment upon milk imported into Virginia, and therefore without the consent of Congress, lays an impost or duty upon imports not absolutely necessary for executing its inspection laws. The assessment complained of was provided to cover the expenses of the Milk Commission and the local milk boards to be appointed to carry out the purposes of the act. The relevant provisions of the act and of the regulations in pursuance thereof are as follows:

"Section 9. The Milk Commission shall prepare an annual budget and shall collect the sums of money required for this budget from the local milk boards in the form of monthly assessments, and the local milk boards shall pay the assessments so levied. The assessments so levied shall not exceed two cents per hundred pounds of milk handled in each market in which the provisions of this act are in operation."

"Section 11. * * * (b) *Expenses.* The expenses of the milk board, including salaries and/or the per diem of such personnel as the board finds it necessary to employ to properly carry out its functions under this act, and including the assessments levied by the State Milk Market Commission, shall be met by an assessment of not over two cents per hundred pounds of milk and/or cream (converted to terms of milk of four per cent butterfat) handled by distributors and not over two cents per hundred pounds of milk and/or cream (converted to terms of milk of four per cent butterfat) sold by producers."

"Regulation No. 6. *Assessments by the Milk Board.* Each distributor shall pay to the Milk Board all assessments levied on him by the Milk Board (except on that milk which has been purchased from licensed distributors) and shall deduct and pay to the Milk Board all assessments levied by the Board on each producer delivering milk to him. No assessment on producers shall exceed 2¢ per hundred pounds of milk, and no assessment on distributors shall exceed 2¢ per hundred pounds of milk. 1¢ per hundred pounds of milk shall be levied and collected by the Milk Board on all milk received by a distributor and 1¢ per hundred on all milk sold or used by a distributor. Such assessment shall be collected on the fifteenth day of each month following the previous delivery period, and delivered to the secretary of the State Milk Commission for deposit to the account of the State of Virginia."

It thus appears that the Milk Commission, in order to cover its own expenses, has directed the levy of an assessment of 1 cent per hundred pounds on milk received by a distributor and 1 cent per hundred pounds on milk sold by a distributor. The Local Milk Board, when set up, would be empowered to levy an additional sum not exceeding the maximum provided in the act to cover its own expenses. The terms of these sections of the act and of regulation 6, it is urged, would require the dairy in Washington, if licensed as a distributor to handle milk for sale in Virginia, to pay an assessment not exceeding 2 cents per hundred pounds on all milk sold by it to High in Washington and shipped by it in interstate commerce to his stores in Virginia. We need not stop to consider this point, for, as we have seen, the dairy is not required by the act to take a license.

However, it is also said that even if the dairy be not licensed as a distributor, nevertheless the assessment would bear upon interstate commerce, because High, pur-

chasing all of the milk sold by him in Virginia from the dairy, would be required to pay an assessment thereon of not more than 2 cents per hundred pounds, an assessment he would not have to pay under Regulation 6 if he purchased his milk from a Virginia distributor. Under the law, High would not pay an assessment on milk purchased by him from a licensed distributor in Virginia, because the assessment would have already been paid by the latter; but if High should buy from a producer in Virginia, he would pay for the use of the Milk Commission 1 cent per hundred pounds, and the remainder of the assessment would be deducted from the price paid the producer. Even so, it is difficult to understand how interstate commerce would be burdened or interfered with as a practical matter. Obviously, the sales by the dairy to High in Washington, and the subsequent interstate shipment of the goods, would not be curtailed if the dairy, not being subject to Virginia price regulation, could continue to sell cultured whole milk at its wholesale price of 6 cents per quart as against 11 cents which a Virginia distributor would be required to charge. The assessment of 2 cents per hundred pounds paid by High in Virginia would be exactly the same as that borne by milk produced and distributed in Virginia; and the imposition of the assessment puts the merchandise shipped from Washington on equality with all other merchandise in the state, and constitutes no hindrance to the introduction of the goods from Washington into the state for sale upon the basis of equal competition with the local product.

Furthermore, the assessment is levied upon the goods after they have reached their destination in Virginia and the state has acquired the power to impose a tax or assessment upon them to defray the expenses of the administration of the law. It is well established that there is no burden upon interstate commerce from the imposition of a state tax upon goods which have come to rest in the state at the end of interstate transportation, provided that the state law levies the same tax on all goods of the same sort without regard to their origin. The prohibition contained in article 1, § 10, cl. 2 of the Constitution forbidding a state to lay imposts or duties on imports or exports is not applicable to such a statute and the validity thereof must be determined by deciding whether it amounts to a regulation of interstate commerce in violation of article 1, § 8, cl. 3 of the Constitution.

In Sonneborn Bros. v. Cureton, 262 U.S. 506, 43 S.Ct. 643, 67 L.Ed. 1095, the Supreme Court was called upon to decide whether oil transported from New York to the warehouse of the taxpayer in Texas and there held for sale in Texas in original packages and subsequently sold in Texas in such packages, might be made the basis of an occupation tax based upon the gross amount of sales in the state, the tax applying to all wholesale dealers in oil engaged in making sales and delivery in Texas. The court said (262 U.S. 506, 508, 43 S.Ct. 643, 644, 67 L.Ed. 1095): "Our conclusion must depend on the answer to the question: Is this a regulation of, or a burden upon, interstate commerce? We think it is neither. The oil had come to a state of rest in the warehouse of the appellants, and had become a part of their stock with which they proposed to do business as wholesale dealers in the state. The interstate transportation was at an end, and, whether in the original packages or not, a state tax upon the oil as property or upon its sale in the state, if the state law levied the same tax on all oil or all sales of it, without regard to origin, would be neither a regulation nor a burden of the interstate commerce of which this oil had been the subject." The same doctrine was applied in Wiloil Corp. v. Pennsylvania, 294 U.S. 169, 175, 55 S.Ct. 358, 360, 79 L.Ed. 838, where it was said: "Our decisions show that, if goods carried from one state have reached destination in another where they are held in original packages for sale, the latter has power without discrimination to tax them as it does other property within its jurisdiction. Woodruff v. Parham, supra [8 Wall. 123, 19 L.Ed. 382]; Brown v. Houston, 114 U.S. 622, 632, 5 S.Ct. 1091, 29 L.Ed. 257; American Steel & Wire Co. v. Speed, 192 U.S. 500, 519–522, 24 S.Ct. 365, 48 L.Ed. 538; Sonneborn Bros. v. Cureton, 262 U.S. 506, 43 S.Ct. 643, 67 L.Ed. 1095. And as that rule applies whether the burden falls directly or indirectly (Banker Bros. Co. v. Pennsylvania, 222 U.S. 210, 32 S.Ct. 38, 56 L.Ed. 168), it is not material whether the tax is upon the sale and delivery or upon the property."

We find no ground in this case for equitable relief, and therefore the application for temporary restraining order, and for interlocutory and permanent injunctions, will be denied, and the bill of complaint will be dismissed.